# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE HYDROXYCUT MARKETING AND SALES PRACTICES LITIGATION | CASE NO. 09md2087 BTM (CAB) |
| | (S.D. Cal. No. 09cv1088) |
| ANDREW DREMAK, on behalf of himself, all others similarly situated and the general public, | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS THE FIRST CONSOLIDATED AMENDED CLASS ACTION COMPLAINT** |
| Plaintiff, | |
| vs. | |
| IOVATE HEALTH SCIENCES GROUP, INC., et al., | |
| Defendants. | |

Pursuant to Fed. R. Civ. P. 12(b)(1), 12(b)(6), and 9(b), defendants Iovate Health Sciences, Inc. and Iovate Health Sciences U.S.A., Inc., ("Manufacturer Defendants" or "Iovate") and GNC Corporation, Wal-Mart Stores, Inc., Walgreens Company, CVS Caremark Corp., and Vitamin Shoppe Industries, Inc. ("Retailer Defendants") have filed a motion to dismiss the First Consolidated Amended Class Action Complaint. Defendants BJ's Wholesale Club, Inc., Kmart

1 Corporation, Rite-Aid Hdqtrs. Corp., and NBTY Inc. have joined in the motion to dismiss.[1]  For

2 the reasons set forth below, the motion to dismiss is **GRANTED IN PART** and **DENIED IN**

3 **PART.**

4

5 **I.  FACTUAL BACKGROUND**

6      On December 22, 2009, the First Consolidated Amended Class Action Complaint

7 ("complaint" or "FAC") was filed in this multi-district litigation.   Twenty named plaintiffs

8 ("Plaintiffs" or "named Plaintiffs") assert claims on behalf of themselves and a putative

9 nationwide class of "[a]ll persons who purchased Hydroxycut-branded products."  (FAC ¶ 83.)

10 The Hydroxycut-branded products ("Products") consist of 14 specific Hydroxcut-branded

11 products.  (FAC ¶ 1.)[2]

12      The following facts are taken from the allegations of the FAC.  The Court makes no

13 findings regarding the truthfulness of the allegations.

14      According to the FAC, Iovate advertised their products as being safe and effective for,

15 among other things, weight loss, and spent tens of millions of dollars sending this message to

16 consumers  through  an  extensive  advertising  campaign  in  a  variety  of  media,  including

17 television, newspapers, magazines, direct mail, the internet, point-of-sale displays, and on the

18 product labels.  It turns out, however, that certain ingredients in the products were unsafe and

19 are  associated  with  cases  of  severe  hepatotoxicity  and  other  serious  health  ailments.

20 Moreover, the formula was never clinically proven to be effective for weight loss.

21      The FAC specifically alleges that in 1999, Iovate announced the release of Hydroxycut-

22 branded products – Iovate's self-described "highly effective weight-loss supplement." (FAC ¶

23 _____

24      [1]   These joining defendants together with the other Retailer Defendants shall be
25 collectively referred to as the "Retailer Defendants."  All of the defendants shall be collectively
referred to as "Defendants."

26      [2]  The specific products are: Hydroxycut Regular Rapid Release Caplets, Hydroxycut
Caffeine-Free Rapid Release Caplets, Hydroxycut Hardcore Liquid Caplets, Hydroxycut Max
27 Liquid Caplets, Hydroxycut Regular Drink Packets, Hydroxycut Caffeine-Free Drink Packets;
Hydroxycut Hardcore Drink Packets (Ignition Stix), Hydroxycut Max Drink Packets, Hydroxycut
28 Liquid Shots, Hydroxycut Hardcore RTDs (Ready-to-Drink), Hydroxycut Max Aqua Shed,
Hydroxycut 24, Hydroxycut Carb Control, and Hydroxycut Natural.

40.)  Although Hydroxycut products are sold under various names, each contains herbal extracts that cause severe chemical-induced liver damage.  (FAC ¶¶ 41-42.)  One of the ingredients, garcinia cambogia, is a fruit native to Asia and Africa and used by very poor people to make meals more filling.  (FAC ¶ 43.)  Its main component, from which the name "Hydroxycut" is derived, is hydroxycitric acid ("HCA").  (Id.)  HCA was initially studied in rodents as a possible treatment for obesity, but clinical studies failed to establish its effectiveness in humans.  (FAC ¶ 43.)

Plaintiffs alleged that Iovate broadly marketed the Hydroxycut products through a variety of media, and both impliedly and expressly stated that the Hydroxycut products are safe and effective. (FAC ¶¶ 44-56.)  For example, Iovate represented that the products are "clinically proven" to help consumers "lose weight fast," "increase energy," "burn calories," "control appetite," and that they are "doctor formulated," "backed by science," and "extremely safe," "without any unwanted side effects."  (FAC ¶¶ 52-56.)  The Products' packaging stated, "Hydroxycut really does work – fast!"  (FAC ¶ 54.)

According to Plaintiffs, Federal Trade Commission rules required that Iovate actually have the level of proof claimed – i.e., clinical proof – at the time the claims were made.  (FAC ¶58.) However, there was no clinical proof of Hydroxycut's safety or efficacy.  (FAC ¶¶ 53, 54, 58-71.)  For example, in a study commissioned by Iovate, the subjects using Hydroxycut actually lost *less* weight than the placebo group.  (FAC ¶ 59.)  In fact, for nearly a decade, doctors and scientists have questioned the safety and efficacy of Hydroxycut products.  (FAC ¶ 60.) Iovate's director of research until 2002 allegedly admitted, "the majority of products they put on their shelves don't have pure clinical research to support them."  (FAC ¶ 59.)

As early as 2005, doctors began reporting cases of individuals presenting with rhabdomyloysis, hepatotoxicity, and other health problems  after taking Hydroxycut.  (FAC ¶¶ 63-68.)  In April 2009, the FDA stated that "[t]hree lines of evidence derived from multiple disparate sources suggest it is very likely that exposure to Hydroxycut capsules/caplets can cause idiosyncratic hepatotoxicity."  (FAC ¶ 75.)

1    On May 1, 2009, the FDA issued a press release warning consumers to immediately
2    stop using Hydroxycut products based on reports of serious health problems ranging from
3    jaundice and elevated liver enzymes to seizures, cardiovascular disorders, and rhabdomyolysis
4    – a condition which can lead to other serious health problems such as kidney failure.  (FAC ¶
5    77.)  The FDA had received one report of a death due to liver failure.  (Id.)  A day after the FDA
6    warning, Iovate announced a recall, but, according to Plaintiffs, continued to mislead and
7    downplay the health risks associated with their products.  (FAC ¶ 80.)

8    Plaintiffs allege that Defendants' advertising and marketing campaign was designed to
9    cause consumers to buy Hydroxycut products.  (FAC ¶ 82.)  As a result of Defendants'
10   advertising campaigns, consumers did buy the products and Hydroxycut became the top selling
11   weight-loss supplement with over nine million units sold in 2008. (FAC ¶ 82.) Hydroxycut sales
12   allegedly exceeded $350 million in a single year.  (Id.)

13   According to the FAC, each of the named Plaintiffs was exposed to and read
14   Defendants' advertising claims, including the representations on the Products' labeling.  (FAC
15   ¶¶ 7-26.)  Each of the named Plaintiffs purchased Hydroxycut Products, believing they were
16   safe and effective as a dietary supplement and for weight-loss purposes.  (Id.)  At the time
17   Plaintiffs purchased and used the Products, Plaintiffs did not know that the Products posed
18   serious adverse health risks and were not proven effective.  (Id.)  After learning of the potential
19   serious health-risks associated with the consumption of the Products, Plaintiffs stopped
20   consuming the Products.  (Id.)  As a result of their purchases of Hydroxycut, Plaintiffs have lost
21   money and property, including the purchase price for the Products.  (Id.)  Some plaintiffs have
22   also incurred costs of testing their health.  (FAC, ¶¶ 170, 186.)

23   The FAC asserts the following claims: (1) violation of State Consumer Protection Laws
24   on Behalf of Plaintiffs and a Nationwide Class; (2) violation of the Arizona Consumer Fraud Act,
25   Ariz. Rev. Stat. § 44-1521 et seq.; (3) violation of the California Consumers Legal Remedies
26   Act, Cal. Civ. Code §1750 et seq.; (4) Unlawful Business Acts and Practices in violation of Cal.
27   Bus. & Prof. Code § 17200 et seq.; (5) violation of the Florida Deceptive and Unfair Trade
28   Practices Act, Fla. Stat. § 501.201 et seq.; (6) violation of Florida Statutory False Advertising,

09MD2087

Fla. Stat. §§ 817.06 and 817.40-817.47; (7) violation of Georgia's Fair Business Practices Act, Ga. Code Ann. § 10-1-390 et seq.; (8) violation of Louisiana's Unfair Trade Practices and Consumer Protection Law, La. Rev. Stat. § 51:1401 et seq. and § 51:411; (9) violation of Massachusetts' Consumer Protection Act, Mass. Gen. Laws ch.93A; (10) violation of the New Jersey Consumer Fraud Act, N.J. Stat. § 56:8-1 et seq.; (11) violation of § 349 of New York General Business Law: Deceptive Acts and Practices; (12) violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 Pa. Stat. § 201 et seq.; (13) violation of Texas' Deceptive Trade Practices-Consumer Protection Act, V.T.C.A. § 17.41 et seq.; (14) violation of West Virginia's Consumer Credit and Protection Act, W. Va. Code § 46A-6-101 et seq.; (15) breach of express warranty; (16) breach of implied warranty; and (17) unjust enrichment.

## II. LEGAL STANDARDS

### A.   Fed. R. Civ. P. 12(b)(1)

Defendants challenge the complaint, in part, on the ground that Plaintiffs lack Article III standing.  Standing under Article III of the U.S. Constitution is an element of subject matter jurisdiction.  Therefore, Defendants move to dismiss the complaint for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1).

Generally, on a 12(b)(1) motion, unlike a 12(b)(6) motion, a court need not defer to a plaintiff's factual allegations regarding jurisdiction.  But the Supreme Court has held that where a 12(b) motion to dismiss is based on lack of standing, the Court must defer to the plaintiff's factual allegations, and must "presume that general allegations embrace those specific facts that are necessary to support the claim."  Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992) (internal quotation marks omitted).  "[G]eneral factual allegations of injury resulting from the defendants' conduct may suffice."  Id. at 560.  In short, a 12(b)(1) motion to dismiss for lack of standing can only succeed if the plaintiff has failed to make "general factual allegations of injury resulting from the defendant's conduct."  Id. at 561.

09MD2087

**B.   Fed. R. Civ. P. 12(b)(6)**

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) should be granted only where a plaintiff's complaint lacks a "cognizable legal theory" or sufficient facts to support a cognizable legal theory. Balistreri v. Pacifica Police Dept., 901 F.2d 696, 699 (9th Cir. 1988). When reviewing a motion to dismiss, the allegations of material fact in plaintiff's complaint are taken as true and construed in the light most favorable to the plaintiff.  See Parks Sch. of Bus., Inc. v. Symington, 51 F.3d 1480, 1484 (9th Cir. 1995).   Although detailed factual allegations are not required, factual allegations "must be enough to raise a right to relief above the speculative level." Bell Atlantic v. Twombly, 550 U.S. 544, 127 S.Ct. 1955, 1965 (2007).   "A plaintiff's obligation to prove the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Id.  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged - but it has not show[n] that the pleader is entitled to relief." Ashcroft v. Iqbal, __ U.S. __, 129 S,Ct. 1937, 1950 (2009) (internal quotation marks omitted).

**C.   Fed. R. Civ. P. 9(b)**

Defendants contend that to the extent the plaintiffs' claims are grounded in fraud, the heightened pleading standards set forth in Fed. R. Civ. P. 9(b) apply.  Rule 9(b) requires that a plaintiff state a claim for fraud with particularity as follows:

> In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.

Fed. R. Civ. P. 9(b).  A court may dismiss a claim of fraud when its allegations fail to satisfy Rule 9(b) 's heightened pleading requirements. Vess v. Ciba-Geigy Corp. U.S.A., 317 F.3d 1097, 1107 (9th Cir. 2003).

Averments of fraud must be accompanied by the "who, what, when, where, and how" of the misconduct charged. Cooper v. Pickett, 137 F.3d 616, 627 (9th Cir. 1997).  In other words, "the pleader must state the time, place and specific content of the false representations as well

09MD2087

as the identities of the parties to the misrepresentation." <u>Alan Neuman Prods., Inc. v. Albright</u>, 862 F.2d 1388, 1392-93 (9th Cir. 1988).  The plaintiff must also "set forth what is false or misleading about a statement and why it is false." <u>Decker v. GlenFed, Inc. (In re GlenFed, Inc. Sec. Litig.)</u>, 42 F.3d 1541, 1548 (9th Cir. 1994).  Rule 9(b) does not permit a complaint to "lump multiple defendants together but require[s] plaintiffs to differentiate their allegations when suing more than one defendant." <u>Destfino v. Reiswig</u>, 630 F.3d 952, 958 (9th Cir. 2010) (internal quotation marks and citations omitted).

## III.  DISCUSSION

Defendants move to dismiss the FAC on the grounds that (1) Plaintiffs lack Article III standing; and (2) Plaintiffs' claims fail to state a claim and/or fail to plead fraud with particularity as required by Fed. R. Civ. P. 9(b).  For the reasons discussed below, the Court concludes that Plaintiffs have standing to maintain this action.  Therefore, the Court analyzes Plaintiffs' various claims to determine whether the claims should be dismissed under Rule 12(b)(6) and/or Rule 9(b).  The Court separately analyzes Plaintiffs' claims against the Retailer Defendants in Section III.E - the other sections of the discussion pertain to the Manufacturer Defendants only. As detailed below, the Court grants in part and denies in part Defendants' motion to dismiss pursuant to Rules 12(b)(6) and 9(b), and grants Plaintiffs leave to amend their complaint.

## A.  Standing

Defendants first contend that this Court lacks subject matter jurisdiction over this action because Plaintiffs lack standing.  Standing is a necessary element of federal-court jurisdiction under Article III of the Constitution.  <u>Warth v. Seldin</u>, 422 U.S. 490, 498 (1975).  To have standing to sue in federal court, a plaintiff must meet the requirements set forth in the so-called "Case or Controversy Clause" of Article III of the United States Constitution. U.S. Const. art. III, § 2.  That is, a plaintiff must allege "'such a personal stake in the outcome of the controversy' as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." <u>Id.</u> at 498-99 (quoting <u>Baker v. Carr</u>, 369 U.S. 186, 204

09MD2087

(1962)).  "[T]he plaintiff must have suffered an 'injury in fact' – an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical."  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992) (citations, internal quotation marks, and footnote omitted).  A "particularized" injury is one that "affect[s] the plaintiff in a personal and individual way." Id. at 560 n. 1.

Defendants argue that Plaintiffs have failed to plead any injury because Plaintiffs do not claim that they were physically harmed by the Hydroxycut products.  However, the injury to Plaintiffs occurred at the time they purchased the Hydroxycut products and did not receive the benefit of their bargain.  Plaintiffs sought to purchase a safe and effective weight loss product but did not receive the product as promised.  As a result, they have lost the money they paid for the product and have alleged an economic injury.  "Monetary harm is a classic form of injury-in-fact."  Danvers Motor Co. v. Ford Motor Co., 432 F.3d 286, 293 (3rd Cir. 2005).

Defendants' contention that Plaintiffs lack standing because they have failed to plead a *physical* injury caused by Hydroxycut products is without merit.  Courts have held that a plaintiff is injured and has suffered a cognizable and ascertainable loss when he receives less than what he was promised.  See e.g., Ramirez v. STi Prepaid LLC, 644 F. Supp. 2d 496, 501 (D. N.J. 2009).  "As long as plaintiffs allege a legally cognizable loss under the 'benefit of the bargain' or some other legal theory, they have standing."  In re Toyota Motor Corp. Unintended Acceleration Mktg. Sales Practices, and Prod. Liab. Litig., 2010 WL 4867562, at * 10 (C.D. Cal. Nov. 30, 2010).

This case is akin to In re Bayer Corp. Combination Aspirin Products Mktg. and Sales Practices Litig., 701 F. Supp. 2d 356 (E.D.N.Y. 2010).  In In re Bayer, the plaintiffs filed a consolidated class action complaint against a drug manufacturer, alleging that the manufacturer misrepresented the virtues of certain combination low-dose aspirin products.  The plaintiffs brought claims under various state consumer protection laws as well as for unjust enrichment. The plaintiffs alleged that while none of them suffered physical harm, all of them were injured in that they paid for a product that they thought was superior to other low-dose aspirins because of defendants' false representations in marketing materials and product packaging.  According

09MD2087

1  to the plaintiffs, they never would have purchased the aspirin products had they known that the

2  combination aspirin products could not provide the health benefits touted on their labels.

3      Defendants in In re Bayer moved to dismiss the claims for lack of standing.  The

4  defendants argued that because the plaintiffs had not pled any physical injury caused by

5  defects in the combination aspirin products, they had failed to allege the cognizable harm

6  required for Article III standing.  Id. at 377.  The court disagreed.  In denying the motion to

7  dismiss, the court reasoned:

8      Economic injuries are sufficient for standing.  Moreover, courts have long held
       that a plaintiff is injured, suffering an ascertainable loss, when he receives less
9      than what he was promised.  Thus, plaintiffs' allegations that they were misled
       into purchasing a product that was less than what they bargained for are
10     sufficient for Article III standing.

11  Id. at 377-78 (internal citations and parenthetical omitted).

12      Similarly, in Rikos v. Proctor & Gamble Co., __ F. Supp. 2d __, 2011 WL 1707209, at

13  *4-5 (S.D. Ohio, May 4, 2011), Proctor & Gamble challenged the Article III standing of the

14  plaintiff who alleged that Proctor & Gamble engaged in false and misleading advertising

15  regarding the digestive benefits of "Align," a daily food supplement.  Plaintiff alleged that

16  although Procter & Gamble promoted the "clinically proven" digestive benefits of "Align,"in fact,

17  there was no clinical data showing that Align improved digestion.  The Rikos court held that the

18  plaintiff had alleged "injury in fact" in the form of economic injury: "Plaintiff purchased Align in

19  reliance on P&G's claims that the product provides defined health benefits, when these

20  advertisements were allegedly false and deceptive. . . . Accordingly, Plaintiff maintains that [his]

21  purchase of the product is the economic harm, because it was not provided as advertised."  Id.

22  at * 5.  See also In re Celexa and Lexapro Mktg. and Sales Practices Litig., 2010 WL 4644429

23  (D. Mass. Nov. 10, 2010) (holding that the plaintiff sufficiently alleged injury-in-fact where he

24  alleged that the product, an anti-depression drug, was unsatisfactory because it was

25  "inappropriate" and "not efficacious" for his son).

26      Defendants' reliance on "no-injury" products liability cases is misplaced.  Those cases

27  are distinguishable because the plaintiffs in those cases did not allege that the product they

28  purchased was defective.  For example, in Rivera v. Wyeth-Ayerst, 283 F. 3d 315, 319 (5th Cir.

9

09MD2087

2002), the FDA-approved drug at issue, Duract, was recommended for use of short-term management of acute pain.  Some users took the drug for long-term relief and experienced liver failure.  The plaintiffs in Rivera sought to represent all patients who had purchased and ingested Duract but suffered no physical or emotional injury.  The plaintiffs did not claim that Duract was ineffective as a pain killer or has any future health consequences.  The Fifth Circuit held that the plaintiffs lacked standing because Duract worked as to the plaintiffs: "Rivera paid for an effective pain killer, and she received just that - the benefit of her bargain."  Id. at 320.

In O'Neil v. Simplicity, Inc., 574 F.3d 501 (8th Cir. 2009), another "no-injury" products liability case, the plaintiffs sued over their purchase of a crib that was subject to a recall based on a hardware defect that made it possible for the drop-side of the crib to detach from the crib, creating a dangerous gap in which a child could get caught.  The potential defect did not manifest itself in the plaintiffs' crib.  The Eighth Circuit held that because the plaintiffs' crib did not exhibit the alleged defect, the defendants had not failed to deliver what was promised.

Here, Plaintiffs allege that the product they received was defective.  Plaintiffs allege that instead of receiving the advertised safe and "clinically proven" effective Hydroxycut products, they received products that were ineffective and unsafe when used as directed.  (FAC ¶ 1.)  Unlike the plaintiffs in Rivera, who paid for and received an effective painkiller, and the plaintiffs in O'Neil, who paid for and received a working crib, Plaintiffs in this case did not get what they paid for.  According to the FAC, Plaintiffs received a product with no proven weight-loss benefit (indeed, in an Iovate study, the subjects using Hydroxycut lost less weight than the placebo group) and the potential for serious harm.  Thus, Plaintiffs did not get the benefit of their bargain and suffered economic injury.

Defendants also  contend that Plaintiffs lack standing to assert claims under the laws of those states in which no named Plaintiff resides.  Courts are in disagreement over this issue.  For example, in In re Graphics Processing Units Anti-trust Lit., 527 F. Supp. 2d 1011, 1026 (N.D. Cal. 2007), the court held that the named plaintiffs lacked standing to bring antitrust claims under the laws of states in which no named plaintiff resided.  In contrast, in Ramirez v. STi Prepaid LLC, 644 F. Supp. 2d 496 (D.N.J. 2009), the court rejected the defendants'

argument that the plaintiffs could not bring claims based on the violation of consumer protection laws in states where the named plaintiffs did not suffer injury.  The court explained:

> Defendants' argument appears to conflate the issue of whether the named Plaintiffs have standing to bring their individual claims with the secondary issue of whether they can meet the requirements to certify a class under Rule 23. Defendants do not contest the fact that the named Plaintiffs have standing to bring their individual claims. The Complaint makes clear that the so-called "sister state" consumer protection laws are only implicated by members of the putative class. ( See Compl. ¶ 43.) Hence, the fact that the named Plaintiffs may not have individual standing to allege violations of consumer protection laws in states other than those in which they purchased Defendants' calling cards is immaterial. The issue Defendants raise is one of predominance-whether "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed.R.Civ.P. Rule 23(b)(3). See generally 7AA Charles Allen Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice and Procedure § 1780.1 (3d ed. 2008) (discussing the requirements of Rule 23(b)(3)). This is an issue to be resolved at the class certification stage of the litigation.

Id. at 505.  See also In re Bayer, 701 F. Supp. 2d at 377 (explaining that "[w]hether the named plaintiffs have standing to bring suit under each of the state laws alleged is 'immaterial' because they are not bringing those claims on their own behalf, but are only seeking to represent other, similarly situated consumers in those states."); Indergit v. Rite Aid Corp., 2009 WL 1269250, at * 4 (S.D.N.Y. 2009) ("In short, once a named plaintiff establishes individual standing, the issue of whether a named plaintiff can assert claims on behalf of absent class members is determined at the class certification stage of the litigation.")

The Court agrees with the reasoning of the courts that hold that the issue of individual standing is separate and distinct from the inquiry of whether named plaintiffs can meet the requirements to certify a class under Rule 23.  See Newberg on Class Actions § 2:5 (4th ed. 2010) ("The presence of individual standing is sufficient to confer the right to assert issues that are common to the class, speaking from the perspective of any standing requirements. However, whether a plaintiff will be permitted to represent not only individual claims, but also those of parties not directly before the court who have common claims, depends on whether the plaintiff is able to meet additional criteria, apart from threshold standing tests.")  The constitutional issue of standing should not be conflated with Rule 23 class action requirements. "The relevant question . . . is not whether the Named Plaintiffs have standing to sue Defendants–they most certainly do–but whether their injuries are sufficiently similar to those of

1   the purported Class to justify the prosecution of a nationwide class action.  This question is .

2   . . appropriately answered through the class certification process."  <u>In re Bayer</u>, 701 F. Supp.

3   2d at 377 (quoting <u>In re Grand Theft Auto Video Game Consumer Litigation</u>, 2006 WL

4   3039993, at * 3 (S.D.N.Y. Oct. 25, 2006)).  Therefore, the Court denies Defendants' 12(b)(1)

5   motion to dismiss the claims brought under the laws of states in which the named Plaintiffs do

6   not reside.

7

8   **B.    <u>Consumer Protection Claims</u>**

9       Defendants contend that Plaintiffs' consumer protection claims, set forth in Counts I-XIV

10   of the FAC, must be dismissed because Plaintiffs have failed to plead fraud with particularity

11   as required by Fed. R. Civ. P. 9(b).  The Court agrees.

12       As an initial matter, the Court concludes that Rule 9(b) applies to Plaintiffs' consumer

13   protection claims.  When a plaintiff's state law claims rely entirely on a unified course of

14   fraudulent conduct, the claim is "grounded in fraud" or "sounds in fraud" and is subject to the

15   heightened pleading requirements of Rule 9(b).  <u>Vess</u>, 317 F.3d at 1103-04.

16       In <u>Kearns v. Ford Motor Co.</u>, 567 F.3d 1120 (9th Cir. 2009), the Ninth Circuit held that

17   Rule 9(b) applied to the plaintiff's claims under California's Consumers Legal Remedies Act

18   ("CLRA"), Cal. Civ. Code §§ 1750-1784, and California's Unfair Competition Law ("UCL"), Cal.

19   Bus. & Prof. Code §§ 17200-17210.  The Ninth Circuit concluded that the plaintiff, who claimed

20   that Ford made false and misleading statements regarding its Certified Pre-Owned vehicles to

21   induce purchasers to pay extra for such vehicles, was in fact alleging that Ford engaged in a

22   fraudulent course of conduct.  <u>Id.</u> at 1126.  Upon applying Rule 9(b), the Ninth Circuit concluded

23   that the plaintiff failed to allege fraud with specificity:

24       Nowhere in the TAC does Kearns specify what the television advertisements or
        other sales material specifically stated. Nor did Kearns specify when he was
25       exposed to them or which ones he found material. Kearns also failed to specify
        which sales material he relied upon in making his decision to buy a CPO vehicle.
26       Kearns does allege that he was specifically told "CPO vehicles were the best
        used vehicles available as they were individually hand-picked and rigorously
27       inspected used vehicles with a Ford-backed extended warranty." Kearns does
        not, however, specify who made this statement or when this statement was
28       made. Kearns failed to articulate the who, what, when, where, and how of the
        misconduct alleged. The pleading of these neutral facts fails to give Ford the

09MD2087

1
2
3

opportunity to respond to the alleged misconduct. Accordingly, these pleadings do not satisfy the requirement of Rule 9(b) that "a party must state with particularity the circumstances constituting fraud...." Because Kearns failed to plead his averments of fraud with particularity, we affirm the district court's dismissal of his TAC.

4

Id. at 1126.

5
6
7
8

    As in Kearns, Plaintiffs' consumer protection claims are based on a unified course of fraudulent conduct.  Plaintiffs allege that Defendants made false and deceptive representations regarding the safety and efficacy of the Hydroxycut products to induce consumers to purchase the products.  Accordingly, Rule 9(b)'s heightened pleading standard applies.[3]

9
10
11
12
13

    The FAC is more specific than the complaint in Kearns.   The FAC describes representations made on the hydroxycut.com website, a television commercial , GNC's website, and the Products' packaging.  (FAC, ¶¶ 44-56.)  However, it is unclear whether the same representations are made on the packaging of each of the 14 Hydroxycut products at issue. The FAC does not distinguish between the Products.

14
15
16
17

    In addition, it is unclear what representations each Plaintiff relied on.  For each Plaintiff, except plaintiff Byron J. Ronan,[4] the FAC alleges that the Plaintiff "was exposed to and read Defendants' advertising claims, including the Products' labeling."  The FAC does not specify which of the advertising claims each Plaintiff saw or read.

18
19
20
21
22
23

    Furthermore, the FAC does not consistently allege that each Plaintiff saw or read the advertising claims before purchasing the product and purchased the product in reliance on the advertising representations.  In the "Parties" section, where the FAC sets forth the facts as to each Plaintiff, the FAC states as to each Plaintiff (with the exception of Ronan) that the Plaintiff was exposed to and read Defendants' advertising claims and that the Plaintiff purchased a specific Hydroxycut product for consumption.  No facts are alleged as to the timing of the

24
25
26

    [3] Plaintiffs argue that their UCL and CLRA claims are also based on unlawful conduct, and, to that extent, should not be subject to Rule 9(b).  The Court does not find it necessary to reach this issue because Plaintiffs will undoubtedly amend their consumer protection claims anyway.

27
28

    [4] As to Ronan, the FAC is more specific although still not specific enough.  The FAC alleges that "Plaintiff Ronan was exposed to and read Defendants' representations, advertising and promotional claims prepared by the Defendants that were disseminated on local and national media, including television and the Internet."

09MD2087

1  purchase in relation to the Plaintiff's exposure to the advertising claims or as to Plaintiff's

2  reliance on the advertising claims.

3      The facts alleged with respect to Ronan are more specific and include allegations of

4  reliance - "Relying on Defendants' representations in their advertising concerning the safety,

5  efficacy, quality and performance of Hydroxycut, Plaintiff Ronan purchased a two-month supply

6  of Hydroxycut Caplets . . . ."  (FAC ¶ 21.)   In addition, some of the consumer causes of action

7  contain allegations of reliance – <u>see</u> FAC ¶ 103 ("Plaintiff Shortridge and Class members read

8  and relied on the accuracy of the representations on Defendants' advertising and marketing,

9  including the Products' packaging and labeling, in purchasing the Products."); ¶ 185 ("Plaintiffs

10 Ortiz, Ronan and Class members read, and relied upon, the representations on the product

11 packages, as well as Defendants' advertising and marketing materials before purchasing the

12 Products."); ¶ 205 ("Plaintiff Torres and Class members read and justifiably relied on the

13 accuracy of the representations on the Products' packages, as well as Defendants' advertising

14 and marketing materials in purchasing the Products."); ¶ 222 ("Plaintiff Walker and the Class

15 members read the representations on the Products' packages and relied on them, as well as

16 Defendants' advertising and marketing materials in purchasing the Products.").   However,

17 allegations of reliance are lacking as to most of the Plaintiffs.[5]

18     Plaintiffs' consumer protection claims fall short of the specificity required by Rule 9(b).

19 Accordingly, the Court grants Defendants' motion to dismiss Counts I-XIV.  However, the Court

20 grants Plaintiffs leave to amend their claims to include more factual details regarding the

21 circumstances of Defendants' alleged fraudulent course of conduct.

22

23

_____

24     [5] The Court notes that not all of the consumer protection claims brought here require an allegation of actual reliance.  For example, the Florida Deceptive and Unfair Trade Practices

25 Act as alleged in Count V does not require actual reliance.  <u>See</u> <u>Cold Stone Creamery, Inc. v. Lenora Foods, LLC</u>, 332 Fed. Appx. 565, 567 (11th Cir. 2009).  The New Jersey Consumer

26 Fraud Act (Count X) also does not require that a consumer has actually relied on a prohibited act.  <u>See</u> <u>Int'l Union of Operating Eng'rs Local No. 68 Welfare Fund v. Merck & Co.</u>, 929 A.2d

27 1076, 1087 (N.J. 2007).  Similarly, under New York law (Count XI), a plaintiff need only suffer injury as a result of the deceptive act and reliance is not required.  <u>See</u> <u>Morrissey v. Nextel</u>

28 <u>Partners, Inc.</u>, 72 A.D.3d 209, 213 (N.Y. App. Div. 2010).  However, Plaintiffs claims under these state laws fail for the other reasons discussed above.

09MD2087

**C.    Breach of Warranty Claims**

    1.  Failure to Plead Express Warranty

Under U.C.C. § 2-313:

    (1) Express warranties by the seller are created as follows:

      (a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

      (b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

      (c) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

    (2) It is not necessary to the creation of an express warranty that the seller use formal words such as "warrant" or "guarantee" or that the seller have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty.

Because, as discussed above, Plaintiffs have not specifically alleged which representations they saw, heard, or read, Plaintiffs have not sufficiently pled which affirmations or promises formed the "basis of their bargain."  Accordingly, Defendants' motion to dismiss is granted as to Plaintiffs' express warranty claim.

    2.  Breach of Warranty

Defendants contend that Plaintiffs have failed to allege that Defendants breached any express or implied warranty.  Defendants argue that Plaintiffs failed to allege that the Products did not work for them or that they suffered any injury arising from use of the products.

The Court is not persuaded by Defendants' argument.  Although Plaintiffs have not alleged sufficient facts regarding the express promises and affirmations of fact made by Defendants, the gist of their express and implied warranty claims is that Defendants made

09MD2087

representations that the Products were proven to be effective weight-loss supplements and were safe.  However, according to the FAC, the Products were not effective and were unsafe.

Even if any of the Plaintiffs lost weight while taking the drug, it cannot be assumed that the weight loss was due to the Products' effectiveness since in a study commissioned by Iovate, the subjects using Hydroxycut actually lost less weight than the placebo group. Furthermore, even if Plaintiffs did not suffer any physical injury, the FAC alleges that the product is not safe for consumption.  Therefore, Plaintiffs allege that they did not get what they paid for and have sufficiently alleged breach of warranty.  See In re Bayer, 701 F. Supp. at 383-84 (holding that plaintiffs had stated a claim for breach of warranty by alleging that the combination products could not fulfill the promises Bayer made on the labeling and that Bayer had falsely implied that the combination products had been FDA-approved); Rikos, 2011 WL 1707209, at * 14 (holding that  plaintiff stated a claim for breach of express warranty where plaintiff alleged that "Align" did not have proven digestive health benefits as advertised by Proctor & Gamble and was nothing but sugar-filled capsules injected with a small amount of unremarkable bacteria).

The cases cited by Defendants are distinguishable because they involve non-consumable products that never manifested the defect and therefore performed satisfactorily. See, e.g., Weaver v. Chrysler Corp., 172 F.R.D. 96, 99 (S.D.N.Y. 1997) (involving alleged defect in shoulder belt clip and holding, "Where, as here, a product performs satisfactorily and never exhibits the alleged defect, no cause of action lies."); Briehl v. GMC, 172 F.3d 623, 263-38 (8th Cir. 1999) (upholding dismissal of complaint because plaintiffs failed to allege any manifest defect in their ABS brakes, which have performed satisfactorily); Feinstein v. Firestone Tire & Rubber Co., 535 F. Supp. 595, 603 (S.D.N.Y. 1982) (explaining that even if there were "common defects" in Firestone tires, individuals whose tires performed as warranted cannot maintain claims).  Based on the allegations of the FAC, it cannot be said that Plaintiffs received a satisfactory product.

///

///

09MD2087

3.  <u>Notice</u>

Defendants also seek to dismiss Plaintiffs' breach of express and implied warranty claims on the ground that Plaintiffs have not adequately pled that they gave notice to the sellers prior to bringing their breach of warranty claims.

Under U.C.C. § 2-607(3)(a), a buyer "must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy . . . ." In the FAC, Plaintiffs allege, "All conditions precedent, including notice, to Defendants' liability under this contract have been performed by Plaintiffs and the Class." (FAC ¶ 240.) Although Plaintiffs do not provide specific facts regarding the notice each named Plaintiff gave, the Court finds that Plaintiffs have sufficiently pled notice.

The Court declines to require Plaintiff to provide more specific facts regarding notice at this time because pre-litigation notice is not strictly required under the laws of a number of states. "[A] significant body of case law from around the country holds that the reasonable notice requirements of UCC § 2-607(3)(a) should be judged under a relaxed standard when the suit is brought by a retail consumer of the product." <u>Buzadzhi v. Bexco Enter., Inc.</u>, 2011 WL 43086, at * 1 (N.D. Okla.  Jan. 4, 2011). In New York, the notice requirement does not even apply to cases involving goods sold for human consumption. <u>Fischer v. Mead Johnson Lab.</u>, 41 A.D.2d 737 (N.Y. App.  Div.1973). Moreover, under the laws of a number of states, the filing of a complaint can serve as notice. <u>See, e.g.</u>, <u>Bednarski v. Hideout Homes & Realty, Inc.</u>, 709 F. Supp. 90, 93 (M.D. Pa. 1988); <u>Panda Capital Corp. v. Kopo Intern., Inc.</u>, 242 A.D.2d 690, 691 (N.Y. 1997); <u>Armco Steel Corp. v. Isaacson Structural Steel Co.</u>, 611 P.2d 507, 513 (Alaska 1980).[6]

---

[6] The Court acknowledges that there are some states such as Texas and Alabama that do not treat non-injury consumer suits differently and require pre-litigation notice. <u>See, e.g.</u>, <u>U.S. Tire-Tech, Inc. v. Boeran, B.V.</u>, 110 S.W.3d 194 (Tex. App. 2003); <u>Hobbs v. General Motors Corp.</u>, 134 F. Supp. 2d 1277 (M.D. Ala. 2001). If Defendants contend that Plaintiffs have not complied with the notice requirements of these states, Defendants can bring a motion for summary judgment on the corresponding breach of warranty claims.

09MD2087

4.  Privity

Defendants contend that Plaintiffs' breach of express and implied warranty claims under Alabama, Florida, Georgia, and New York law and Plaintiffs' breach of implied warranty claim under Arizona law also fail because Plaintiffs have failed to plead privity between Iovate and Plaintiffs.

Under Georgia law, privity is required to maintain an action for breach of express or implied warranty.  Dunant v. Wilmock, Inc., 335 S.E.2d 162, 163 (Ga. Ct. App. 1985).  Under the laws of Alabama, Florida, and New York, it appears that privity is required in implied warranty cases only.  See Jesmer v. Retail Magic, Inc., 55 A.D.3d 171, 185-86 (N.Y. App. Div. 2008) (holding that lower court erred in dismissing express warranty claim but properly granted motion to dismiss implied warranty claims due to lack of privity between the plaintiff, an end-user of a POS system, and the manufacturer of the system); Smith v. WM. Wrigley Jr. Co., 663 F. Supp. 2d 1336, 1342 (S.D. Fla. 2009) (explaining that although it is well-settled under Florida law that a plaintiff cannot recover economic losses for breach of implied warranty in the absence of privity, the Florida Supreme Court has not provided similar clarification for express warranty claims); Certainteed Corp. v. Russell, 883 So.2d 1266, 1270 (Ala. Civ. App. 2003) ("Under the UCC as adopted in Alabama, a consumer seeking to recover for only economic injury and property damage has a valid implied-warranty claim against only his or her immediate seller with whom the consumer is in privity.").

Plaintiffs contend that they have satisfied any privity requirement by pleading that Iovate warranted the Products through retailers "through the doctrine of agency."  (FAC ¶ 242.) According to the FAC, "[t]he Retailer Defendants . . . further enabled Iovate and MuscleTech to make representations concerning the quality of the Products" by advertising and selling the Products.  (FAC ¶ 48.)

Privity between a plaintiff and the manufacturer of a product can be satisfied by establishing that the direct seller of the product was acting as an agent for the manufacturer of the product.  See, e.g., Hodgson, Russ, Andrews, Wood & Goodyear, LLP v. Isolatek Int'l Corp., 300 A.D.2d 1051, 1052 (N.Y. App. Div. 2002)  (holding that there was a triable issue of

fact whether a defendant who applied a spray-on fireproofing material was an agent for the manufacturer of the material and thus whether plaintiff is in privity with the manufacturer). Here, however, Plaintiffs' allegations of agency are conclusory and are devoid of facts tending to show that any agency relationship exists. Although Plaintiffs' claim of agency is not subject to a heightened pleading requirement, Plaintiffs must allege sufficient fact to support a plausible claim of agency.

Accordingly, Plaintiffs' express warranty claim under Georgia law is dismissed for the additional reason that Plaintiffs have failed to establish privity between Plaintiffs Major and Rhoden and Iovate. Plaintiffs' implied warranty claims under the laws of Georgia, Alabama, Florida, and New York are also dismissed for failure to plead sufficient facts showing privity between the Plaintiffs residing in those states and Iovate.

## D.    Unjust Enrichment Claim

Count XVII of Plaintiffs' FAC alleges a claim for "Unjust Enrichment."  Defendants contend that no separate claim for unjust enrichment exists under California law and that, therefore, the claim must be dismissed as to each California Plaintiff.  Whether unjust enrichment is viewed as an element of damages or a separate claim, the unjust enrichment claim is dismissed in its entirety because it is premised on the false and deceptive advertising that has not been pled with particularity.

However, upon amending their complaint and pleading Defendants' fraudulent conduct with particularity, Plaintiffs may include a claim for unjust enrichment under California law as well as the laws of the other states.  In a recent decision, which the Court believes is worth quoting at length, the Northern District of California summarized the competing approaches to unjust enrichment and explained that the two approaches do not necessarily conflict:

> Decisions in both this federal district as well as in California state courts diverge on the proper way to conceptualize unjust enrichment. The differences center on the availability of the unjust enrichment theory as an independent claim for relief. Sometimes, courts read a plaintiff's claim for unjust enrichment as a cause of action. See, e.g., Ghirardo v. Antonioli, 14 Cal. 4th 39, 50 (1996) (recognizing that a plaintiff may advance a stand-alone claim for unjust enrichment, particularly where he or she seeks restitution and other remedies are inadequate). As such, these courts focus on whether the facts demonstrate a defendant's unjust receipt

of some benefit.  Other courts cast unjust enrichment as an *effect*: it is simply the thing that needs remedying.   This view differs chiefly in that it does not perceive unjust enrichment to be a claim for relief at all, but instead as an effect that must be tethered to a distinct legal theory or plea for relief, like an action premised on a quasi-contract theory.  See McKell v. Wash. Mut., Inc., 412 Cal. App. 4th 1457, 1489 (2006); Melchior v. New Line Productions, Inc., 106 Cal. App. 4th 779, 793, (2003) ("The phrase 'unjust enrichment' does not describe a theory of recovery, but an effect: the result of a failure to make restitution under circumstances where it is equitable to do so.").

In several key respects, though, the two approaches do not necessarily compete and can be harmonized.  Under both views, the effect of unjust enrichment is remedied with some form of restitution.  See, e.g., Doe I v. Wal-Mart Stores, Inc., 572 F.3d 677, 684 (9th Cir.2009) ("Unjust enrichment is commonly understood as a theory upon which the remedy of restitution may be granted."); Restatement of Restitution § 1 (1936) ("A person who has been unjustly enriched at the expense of another is required to make restitution to the other.").   Given the appropriate facts (the independent claim concept would characterize what follows as "elements"), a plaintiff advances a basis for obtaining restitution if he or she demonstrates defendant's receipt and unjust retention of a benefit.  See Lectrodryer v. SeoulBank, 77 Cal. App. 4th 723, 726 (2000); First Nationwide Savings v. Perry, 11 Cal. App. 4th 1657, 1662-63 (1992).  "The fact that one person benefits another is not, by itself, sufficient to require restitution." McBride v. Boughton, 123 Cal. App. 4th 379, 389 (2004) (quoting First Nationwide Savings v. Perry, 11 Cal. App. 4th 1657, 1662 (1992)).  Instead, "[t]he person receiving the benefit is required to make restitution only if the circumstances are such that, as between the two individuals, it is unjust for the person to retain it." Id.  (internal quotation marks and citations omitted).

The benefit of the narrower view is that it perhaps more effectively delineates precisely what unjust enrichment means and how it works.  The bare unjust enrichment claim seems to suggest a plaintiff can recover any time a defendant retains a benefit to which he or she was not entitled.  The historic application of the equitable theory suggests this is not necessarily so.  There are a handful of factual scenarios where a theory of unjust enrichment has historically supported a restitutionary remedy. [Footnote omitted.] A plaintiff may, for example, advance a claim as an alternative to breach of contract damages when the parties have a contract that was procured by fraud or is for some reason unenforceable.  See McBride v. Boughton, 123 Cal. App. 4th 379, 388 (2004).  Or, where the plaintiff cannot assert title or right to possession of particular property, but nevertheless can show just grounds for recovering money to pay for some benefit the defendant received from him, "the plaintiff has a right to restitution at law through an action derived from the common-law writ of assumpsit" (this method implies a contract at law, or a quasi-contract).  See Great-West Life & Annuity Ins. Co. v. Knudson, 534 U.S. 204, 213 (2002) ("Such claims were [historically] viewed essentially as actions at law for breach of contract (whether the contract was actual or implied).").  Finally, a plaintiff may seek restitution in equity, ordinarily in the form of a constructive trust or an equitable lien, where money or property "identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession." Id.

Monet v. Chase Home Finance, LLC, 2010 WL 2486376, at * 2-3 (N.D. Cal. June 16, 2010).

1   If Plaintiffs remedy the pleading deficiencies with respect to Defendants' false and
2   deceptive representations, Plaintiffs will have a basis for recovery under a theory of unjust
3   enrichment, whether viewed as a separate claim, an element of damages, or a remedy.

4

5   **E.      Claims Against the Retailer Defendants**

6       The Retailer Defendants move to dismiss the claims against them on the ground that
7   other than generalized allegations regarding GNC's advertising, the FAC is devoid of facts
8   showing that they did anything other than sell the Hydroxycut products.  The Court agrees that
9   Plaintiffs have not alleged sufficient facts to state a claim under the various state consumer
10  protection laws or to state claims for breach of express warranty or unjust enrichment.

11      With respect to the consumer protection claims, the Court agrees with Defendants that
12  Plaintiffs must establish that the Retailer Defendants somehow participated in, controlled, or
13  adopted the deceptive advertising.  In In re Jamster, 2009 WL 1456632, at * 8 (S.D. Cal. 2009),
14  the court dismissed UCL and CLRA claims against wireless providers because plaintiffs'
15  allegations that the wireless providers knew about the deceptive marketing of content providers
16  (who provided ring tones and other content to the customers of the wireless providers) was
17  "insufficient to show that Wireless Providers controlled, participated, approved, marketed or
18  otherwise adopted Content Providers' advertising practices."  Id.   See also Emery v. Visa Int'l
19  Serv. Ass'n, 95 Cal. App. 4th 952, 960 (2002) ("A defendant's liability must be based on his
20  personal 'participation in the unlawful practices' and 'unbridled control' over the practices that
21  are found to violate sections 17200 or 17500.").

22       Plaintiffs suggest that the Defendant Retailers can be held liable under the consumer
23  protection laws for placing the falsely advertised Products on the shelf and failing to disclaim
24  the Manufacturer Defendants' representations.  However, none of the cases cited by Plaintiffs
25  – see Opp. at 16 n. 9 – supports this legal proposition.

26      The FAC claims that the Retailer Defendants themselves promoted and marketed the
27  Products. (FAC ¶ 44.) However, the only representations by Retailer Defendants that Plaintiffs
28  describe with any detail are the following statements made by GNC on its website:

1

2
> Hydroxycut® Hardcore makes all other fat burner obsolete.  It is the most extraordinary powerful fat burner ever developed.

3
> * * *

4
> Beyond a shadow of a doubt, there is no other women's fat burner on the market more extreme than Hydroxycut® Max!  We dare you to try it!

5
> * * *

6

7
> Introducing new and advanced Hydroxycut® – an effective, patent-pending weight loss formula with key components that have been scientifically proven to help you lose weight fast, increase energy, burn calories, and control appetite.

8

9
(FAC ¶ 51.)  These statements by GNC could potentially support a consumer protection claim

10
against GNC.  As currently pled, however, the complaint does not state that the Plaintiffs who

11
purchased their Products from GNC saw these statements on GNC's website before

12
purchasing the Products and relied on them.  As previously discussed, the FAC lacks specificity

13
with respect to which of "Defendants' advertising claims" each Plaintiff saw, heard, or read.

14
Because the FAC fails to allege facts showing that (1) the Retailer Defendants

15
participated in, controlled, or adopted as their own, representations made by Iovate, or (2)

16
made their own representations regarding the Products that Plaintiffs relied on in purchasing

17
the Products, the Court dismisses the consumer protection claims, express warranty claim, and

18
unjust enrichment claims as to the Retailer Defendants.  The Court grants Plaintiffs leave to

19
amend their claims against the Retailer Defendants.  In amending their complaint, Plaintiffs

20
should keep in mind the pleading requirements of Rule 9(b).

21

22
## IV.  CONCLUSION

23
For the reasons discussed herein, the Court **GRANTS IN PART** and **DENIES IN PART**

24
Defendants' Motion to Dismiss Plaintiffs' First Consolidated Amended Class action Complaint.

25
**[09md2087 - Doc. No. 84; 09cv1088 - Doc. No. 117]**.  The Court **DISMISSES** Counts I-XIV

26
(state consumer protection claims), XV (breach of express warranty), and XVII (unjust

27
enrichment) as against the Manufacturer Defendants and Retailer Defendants.  The Court also

28
**DISMISSES** the implied warranty claims (Count XVI) under the laws of Georgia, Alabama,

09MD2087

Florida, and New York as against the Manufacturer Defendants.  The Court grants Plaintiffs leave to amend their complaint to remedy the deficiencies identified above.  Plaintiffs shall file their Second Amended Consolidated Complaint within 60 days of the entry of this Order.

Upon the filing of the Second Amended Complaint, Defendants shall review and decide whether they wish to make a further motion to dismiss.  If so, Defendants shall set forth their grounds for such motion in a succinct 3-page status report to which Plaintiffs may append a 3-page response.  The joint status report shall be filed with the Court by September 5, 2011.  The Court will then set a status conference to determine whether leave to file further motions to dismiss shall be granted.  If Defendants decide to answer rather than file a motion to dismiss, they shall file and serve their Answer within 30 days of the filing of the Second Amended Complaint.

DATED:  May 31, 2011

Honorable Barry Ted Moskowitz
United States District Judge

09MD2087