1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

IN RE HYDROXYCUT MARKETING
AND SALES PRACTICES LITIGATION

CASE NO. 09md2087BTM (CAB)

**[REDACTED]
ORDER DENYING KERR
INVESTMENT HOLDING CORP.
F/K/A IOVATE HEALTH SCIENCES
GROUP INC.'S MOTION TO
DISMISS FOR LACK OF
PERSONAL JURISDICTION**

Defendant Kerr Investment Holding Corp. f/k/a Iovate Health Sciences Group Inc. ("Kerr"), has filed a consolidated motion to dismiss for lack of personal jurisdiction under Fed. R. Civ. P 12(b)(2).  In a number of the individual cases, Kerr has filed separate motions to dismiss for lack or personal jurisdiction that incorporate by reference the briefing on the consolidated motion.  For the reasons discussed below, Kerr's motions are **DENIED**.

## I.  BACKGROUND

On December 22, 2009, twenty named plaintiffs filed a First Consolidated Amended Class Action Complaint ("CCA Complaint") in this case against Kerr, Iovate Health Sciences, Inc. ("Iovate Sciences"), Iovate Health Sciences U.S.A. Inc. (" Iovate USA"), GNC Corporation,

1

09md2087

Wal-Mart Stores, Inc., Walgreens Company, CVS Caremark Corp., and Vitamin Shoppe Industries, Inc. The CCA asserts claims for violation of various state consumer protection and unfair competition laws, breach of express and implied warranties, and unjust enrichment based on Defendants' manufacture, marketing, and sale of fourteen Hydroxycut-branded products.

Also pending before the Court are numerous individual personal injury actions that have been transferred as tag-along actions to the In re Hydroxycut Marketing and Sales Practices multi-district litigation. Many of the individual personal injury complaints name Kerr as a defendant in addition to other Iovate defendants, including Iovate Health Sciences Research Inc. ("Iovate Research") and Iovate Health Sciences International Inc. ("Iovate International").

Kerr moves to dismiss the CCA Complaint against it for lack of personal jurisdiction. Kerr has also filed motions to dismiss for lack of jurisdiction in a number of the individual actions (the motions rely upon the papers and argument presented in connection with the Consolidated Motion to Dismiss). [1]

---

[1] According to the Court's review of the docket, individual motions to dismiss for lack of jurisdiction are pending in the following cases:

| Case No. | Case Name | Original Forum |
|---|---|---|
| 09cv2461 | Hamilton v. Iovate | OH |
| 10cv1257 | Ewing v. Iovate | MS |
| 10cv1485 | Snow v. Iovate | KY |
| 10cv1486 | Robertson v. Kerr | NY |
| 10cv1487 | Brown v. Kerr | NY |
| 10cv2257 | Jenkins v. Kerr | NY |
| 10cv2268 | Rankin v. Muscletech | AL |
| 10cv2269 | Austin v. Muscletech | AL |
| 10cv2346 | Roosa v. Kerr | NY |
| 10cv2557 | McCullough v. Iovate | NY |
| 10cv2558 | Porch v. Kerr | NY |
| 10cv2560 | Brugler v. Kerr | NY |
| 10cv2580 | Carter v. Muscletech | AL |
| 10cv2585 | Lacy v. Iovate | TX |
| 10cv2590 | Arnold v. Iovate | AL |
| 11cv27 | Dearman v. Kerr | NY |
| 11cv31 | Mondy v. Iovate | NJ |
| 11cv146 | Harris v. Kerr | NY |
| 11cv186 | Fernandez v. Kerr | NY |
| 11cv253 | Hedrick v. Iovate | AL |
| 11cv255 | Kearney v. Iovate | AL |
| 11cv271 | Harris v. Iovate | NY |

09md2087

## II. LAW GOVERNING PERSONAL JURISDICTION

In an MDL case, the MDL court applies the law of the transferor forum to determine personal jurisdiction.  In re WellNX Marketing and Sales Practices Lit., 2010 WL 3652457, at * 1 (D. Mass. Sept. 15, 2010).  This Court can exercise personal jurisdiction over Kerr only to the extent that the transferor court could have.  In re Dynamic Random Access Memory, 2005 WL 2988715, at * 2 (N.D. Cal. Nov. 7, 2005).

Personal jurisdiction must comport with the applicable state's long-arm statute as well as with the constitutional requirement of due process.  Omeluk v. Langsten Slip and Batbyggeri A/S, 52 F.3d 267, 269 (9th Cir. 1995).  Under due process principles, a court may exercise jurisdiction over a nonresident defendant where the defendant's minimum contacts with the forum state render the maintenance of the action inoffensive to traditional concepts of fair play.

In this case, Plaintiffs do not allege that Kerr itself has minimum contacts with the forum states.  Rather, Plaintiffs seek to impute the contacts of Kerr's subsidiaries to Kerr under the theories of alter ego and agency. "[A] subsidiary's contacts may be imputed to the parent where the subsidiary is the parent's alter ego, or where the subsidiary acts as the general agent of the parent." Harris Rutsky & Co. Ins. Serv., Inc. v. Bell & Clements Ltd., 328 F.3d 1122, 1134 (9th Cir. 2003).  In diversity cases, when determining whether contacts of a subsidiary may be imputed to the parent for purposes of personal jurisdiction, courts look to the choice-of-law rules of the forum  state to decide which state's substantive law on alter ego or agency applies.  See,

| | | |
|---|---|---|
| 11cv318 | Arzola v. Kerr | NY |
| 11cv380 | Shepherd v. Kerr | NY |
| 11cv440 | Barth v. Kerr | NY |
| 11cv549 | Kassimer v. Kerr | OH |
| 11cv620 | Bennett v. Kerr | NY |
| 11cv660 | Thompson v. Iovate | TX |
| 11cv702 | Parker v. Iovate | TX |
| 11cv791 | Dunn v. Iovate | AK |
| 11cv824 | Kann v. Kerr | NY |

Prior to July, 2010, Kerr filed motions to dismiss for lack of personal jurisdiction in a handful of other personal injury actions. However, pursuant to a Court order filed on August 2, 2010, these motions were deemed withdrawn.  It does not appear that Kerr filed new motions to dismiss for lack of personal jurisdiction in these actions.

09md2087

e.g., Bilyeu v. Hohanson Berenson LLP, 2010 WL 3896415, at *9 (W.D. La. Sept. 30, 2010); Hitachi Med. Sys. America, Inc. v Branch, 2010 WL 816344, at * 5 (N.D. Ohio March 4, 2010); Time, Inc. v. Simpson, 2003 WL 23018890, at *2-3 (S.D.N.Y. Dec. 22, 2003).

Defendants do not challenge the existence of personal jurisdiction over the subsidiaries Iovate USA, Iovate Sciences, and Iovate Research, under due process principles or the applicable state long-arm statutes. Assuming the subsidiaries' contacts are sufficient to confer personal jurisdiction over the subsidiaries under the laws of the relevant jurisdictions, if the subsidiaries' contacts are imputed to Kerr, Kerr also satisfies the applicable minimum contacts requirements. Therefore, the focus of the Court's inquiry is on whether the contacts of the subsidiaries may be imputed to Kerr, and the Court need not delve into the differences between the various state long-arm statutes.

Plaintiffs bear the burden of establishing personal jurisdiction over Kerr. Doe, I v. Unocal Corp., 248 F.3d 915, 922 (9th Cir. 2001) (per curiam). However, at this juncture, Plaintiffs need only make a prima facie showing of jurisdiction to survive the motion. Rutsky, 328 F.3d at 1129. Plaintiffs must demonstrate facts that if true would support jurisdiction over Kerr. Id. Unless directly contravened, Plaintiffs' version of the facts is taken as true, and conflicts between the facts contained in the parties' declarations must be resolved in Plaintiffs' favor for purposes of deciding whether a prima facie case for personal jurisdiction exists. Id.

## III. DISCUSSION

Plaintiffs contend that the contacts of Kerr's subsidiaries can be imputed to Kerr under the theories of alter ego and agency. The Court agrees that the contacts of at least Iovate USA can be imputed to Kerr. As discussed below, the Court finds that Plaintiffs have made out a prima facie case that Iovate USA, which sold the Iovate products and brought in almost all of the income of the Iovate companies, acted as Kerr's agent and alter ego. The evidence supports the conclusion that Kerr and its subsidiaries were engaged in a single business enterprise of developing, marketing, and distributing diet and nutritional supplements and that Kerr, through Paul Gardner, dominated and controlled the day-to-day operations of Iovate USA.

09md2087

**A.  FACTS**

**1.  Organization and Functions of the Iovate Entities**

Kerr is the parent company of over 50 corporations (collectively referred to as the "Iovate Companies").  (Kerr Exs. 3, 4.)  Kerr directly owns all of the stock of its subsidiaries Iovate Sciences, Iovate Research, Iovate USA, Iovate International, and Iovate Health Sciences Canada Inc. ("Iovate Canada").  (Id.)  Kerr also directly owns the stock of Iovate Copyright Limited, Iomedix Laboratories Inc., a number of "formulations" companies, a number of "Ontario Limited" companies, and Supplement Trademark Holding Ltd., which in turn directly holds the stock of a number of trademark companies.  (Id.)  The Iovate Companies are engaged in the marketing, distribution, and formulation of diet, muscle building, and health supplements.  (Heikkila Dep. 193:12-194:1.)

Kerr provides "working capital" to its subsidiaries by way of a revolving capital credit facility with the Royal Bank of Canada ("RBC").  (Pica Dep. (Pl. Ex. 2) 123:6-25; Pl. Ex. 27 (Credit Agreement).)  The credit limit on the credit facility is $41 million.  (Pica Dep. 120:8-12.) Kerr is the sole borrower under the credit agreement.  (Pica Dep. 54:1-7; Pl. Ex. 27.)  The main operating companies access the funds through disbursement accounts against which they can write checks.  (Pica Dep. 126:12-19.)  The RBC Credit Agreement also set up a "lock box" arrangement under which all payments made to Iovate USA or Iovate Canada are forwarded to a Lock Box set up with RBC.  (Pl. Ex. 27 at 12.)  RBC is authorized to sweep the Lock Box on a daily basis to set-off any credit balance in the account.  (Id.)  Kerr also provides insurance coverage for its subsidiaries.  Kerr is the named insured on a product liability insurance policy and a general commercial liability policy.  (Pl. Exs. 28, 29.)  The policies cover the subsidiaries, and the product liability insurance policy also insures vendors who sell Iovate products.   (Id.)

Iovate USA was incorporated in Delaware in 2003.  (Pl. Ex. 76, Kerr 3507.)  Pursuant to a Distribution Agreement, Iovate USA buys products from Iovate International and then sells them.  (Pl. Ex. 64.) All of the Hydroxycut products at issue in this MDL were sold to retailers by Iovate USA.  (Heikkila Dep. (Pl. Ex. 1) 153:5-8; Pica Dep. 45:11-19.)  Iovate USA's largest customers are GNC, Wal-Mart, CVS Pharmacy, AAFES, Walgreens, Rite-Aid, and Costco.

09md2087

(Pica Dep. 45:20-46:2.)  Iovate USA sells products to most states.  (Pica Dep. 230:15-21.)  Iovate USA also sells product to internet retailers such as Bodybuilding.com.  (Pica Dep. 47:3-8.)

Iovate International is a Canadian corporation which procures the product sold by Iovate USA through contracts with third-party manufacturers. (Heikkila Dep. 59:4-6.)  No Iovate entity manufactures product.  (Id. at 59:14-19.)  The main third-party manufacturers are Century Foods, HVL, Garden State Nutrition, Douglas Laboratories, and Protein Research, all of which are located in the United States.  (Pica Dep. 41:5-42:12.)  Iovate International obtains rights to the intellectual property relating to the manufactured products by entering into license agreements with the relevant Iovate formulation companies (subsidiaries with names ending in "Formulations Ltd.").  (Pica Dep. 172:12-25.)

The formulation companies each hold the patents and formulations for specific products.  (Heikkila Dep. 74:13-19.)  The formulation companies do not have any operations other than holding these assets. (Id. at 74:20-22.)  HDM Formulations Ltd. holds the Hydroxycut formulas.  (Id. at 74:8-9.)  There are also numbered "Ontario Limited" companies, such as "1795536 Ontario Limited," which can be "shelf companies" without an assigned role, or can hold formulas/patents for future products.  (Id. at 73:17-74:2.)  The formulation companies hold the patents and formulations for current and past products.  (Id. at 74:3-5.)  The "trademark" companies (subsidiaries with names ending in "Trademark Ltd.") hold the trademarks for the products created by the Iovate Companies.  (Pica Dep. 37:11-18.) HDM Trademark Ltd. holds various Hydroxycut trademarks on the U.S. Register and provides a license to Iovate International for the use of the trademarks.  (Heikkila Dep. 58:4-9.)

Iovate Research, a Canadian corporation, provides research and development services to all of the Iovate formulations companies.  (Heikkila Dep. 63:12-20.)  Iovate Research is involved in the reviewing and approval of product labels.  (Pica Dep. 246:7-17.)

Iovate Sciences, a Canadian corporation, provides administrative services to Kerr and the other Iovate Companies.  (Heikkila Dep. 65:20-23.)  Iovate Sciences does not provide services to anyone outside the Iovate group of companies.  (Id. at 194:21-195:4.)  Under a

Services Agreement dated January 1, 2004, between Kerr (then "1328075 Ontario Limited") and Iovate Sciences (then "1599810 Ontario Limited"), Sciences agreed to provide services including general accounting, audits, tax filing and reporting, financial reporting and budgeting, bank reconciliations and cash management, credit checking, pricing, intercompany invoicing, general purchasing, accounts payable, legal, insurance, risk management, and strategic planning and executive management. (Kerr Ex. 9.) It appears that at some point, the Services Agreement was amended to include the provision of services to subsidiaries including Iovate Research, Iovate International, and Iovate USA. (Pl. Ex. 253.) With respect to the products sold by Iovate USA, Iovate Sciences performs the marketing and advertising and employs a sales force that interacts with the third-party vendors. (Heikkila Dep:115:3-6, 171:22-172:9; Pica Dep. 70:12-22.)

Iovate USA's sales make up almost all of the Iovate Companies' income. In 2007, Iovate USA's net sales in the amount of [

**REDACTED**

]

Iovate Sciences and Iovate Research appear to be the only two Iovate Companies that employ non-officer employees. (Heikkila Dep. 119:9-20, 122:6-8; Pica Dep. 34:4-16.) Iovate Sciences employs approximately 300 individuals and Iovate Research employs approximately 20-30 individuals. (Heikkila Dep. 119:9-11.) The Iovate Companies that own tangible assets are Iovate Sciences and Iovate International. (Pica Dep. 36:15-37:8.) Iovate Sciences and Iovate USA are the only Iovate Companies that have held inventory. (Pica Dep. 50:12-19.) With the exception of Iovate USA, the registered corporate offices of each of the Iovate Companies, including Kerr, are located at 381 North Service Road, Oakville, Ontario, Canada. (Heikkila Dep. 120:23-121:2.) The Iovate Sciences and Iovate Research employees all work at the 381 North Service Road address. (Heikkila Dep. 122:2-7.)

09md2087

1    Paul A. Gardiner is, and always has been, the sole director and officer of Kerr. (Heikkila

2  Dep. 103:12-16.)  Gardiner is also the President, Secretary, and Treasurer of Kerr.  (Id. at

3  144:25-145:3.)  For each of the other Iovate Companies, the sole director is either Gardiner or

4  Terry Begley.  Begley has been the sole director of Iovate International, Iovate Research, and

5  Iovate USA since at least January 2005.  (Pl. Ex. 76.)  Gardiner and Begley serve together as

6  officers in one company, Iovate Sciences; Gardiner is the CEO (as well as Director), and Begley

7  is the COO.  (Id.)  Other officer positions within Iovate Sciences, such as CFO and Chief

8  Science Officer, have been filled by different individuals.  Iovate Sciences is the only Iovate

9  Company that remunerates its officers of directors.  (Pica Dep. 209:4-9.)

10

11        **2. Ownership**

12    Since December 31, 1998, The Toronto Oak Trust, formerly known as the Paul Gardiner

13  Family Trust, has owned 100% of the shares of Kerr.  (Pl. Exs 4, 6, 9.)  Gardiner has acted as

14  the trustee of the Trust and appears to be the primary, if not the only, beneficiary of the Trust.

15  (Pl. Exs. 10, 15, 17, 20, 24; Gardiner Dep. 40:19-41:6.) [

16                                **REDACTED**

17                                                                ]

18

19        **3. Profits and the Bonus Plan**

20    Profits from sales of the Iovate products are concentrated in the formulation companies.

21  Under the license agreements between Iovate International and the formulation companies,

22  International agrees to pay the formulation companies royalties consisting of all revenues from

23  the sales, less certain expenses and services.  (Pica Dep. 173:5-16; Ex. 85 (license agreement

24  where Iovate International agrees to pay the formulation company a royalty consisting of all

25  revenues from sales, less certain expenses and 2% of net sales).)  Under its Supply Agreement

26  with Iovate International, Iovate USA's profits are limited to 1.3% of its net sales.  (Pl. Ex. 64.)

27  Iovate Sciences' profits are limited to costs plus 4%.  (Pl. Ex. 26.)

28

09md2087

1    Utilizing a "bonusing down" tax strategy, in certain years, Iovate Sciences and the

2  formulation companies pay profits into an Employee Profit Sharing Plan ("Plan").  (Pica Dep.

3  212:7-213:17.) [

4

5

6                                                        **REDACTED**

7

8

9

10                                                                                                                         ]

11    In or about April 2007, Kerr entered into a loan facility agreement with Iovate Sciences,

12  which allowed Kerr to borrow money from the Plan.  (Pl. Exs. 37-38.)  Kerr delivered a general

13  security agreement in favor of Iovate Sciences as security for the loan.  (Id.)  The funds

14  obtained under this loan facility agreement were "reinvested" into the subsidiary companies.

15  (Pica Dep. 222:10-12.)

16

17        **4.  Gardiner's Involvement in Daily Operations**

18    Gardiner was actively involved in the Iovate Companies' dealings with major retailers

19  such as GNC, Walmart, and Rite-Aid, and other retailers such as Sportika, Vitamin Shoppe and

20  Bodybuilding.com.  Gardiner personally met with representatives from these retailers and also

21  attended meetings regarding these accounts.  See, e.g., Pl. Exs. 123 (Gardiner listed as

22  "required attendee" for 9/5/07 meeting for "Hydroxycut strategy and solution for GNC");164

23  (Gardiner emails Joe Fortunato of GNC on 11/28/07 about meeting with him and asks if the

24  meeting should be just between the two of them or should include others); 185 (Gardiner is a

25  "required attendee" for 12/21/07 meeting with GNC in Pittsburgh); 136 (GNC emails Gardiner

26  topics of discussion for 1/14/08 conference call); 138 (Gardiner thanks Fortunato for meeting

27  him in New York (in January 2008), and Fortunato responds, "I think it is important that we

28  continue to have these get togethers every 3 or 4 months to ensure we are in sync, capitalizing

09md2087

on every opportunity, and driving the business form the top.");186 (Begley inquires whether Gardiner can meet with Rite-Aid buyers and VP on 1/25/08); 176 (Begley indicates that he and Gardiner would attend all meetings on Saturday at the 2008 Arnolds Classic with GNC, BB.com, Boss, any international customer of any significance, and any major direct customer); 178 (email listing meetings set up for Begley with customers and showing Gardiner as an attendee for the 2/7/08 BB.com meeting, 2/11/08 meeting with Sportika, and 2/29/08 Arnolds Classic); 184 (Sportika thanks Gardiner for flying down to meet with them); 227 (Gardiner is a "required attendee" for a 3/25/08 meeting to review Six Star and Hydroxcycut line extension products for Walmart meeting on 4/3/08); 145 (Gardiner confirms his availability for a meeting with Fortunato on March 26, 2008); 148 (Gardiner is a "required attendee" for 4/3/08 Walmart sports nutrition and diet presentations); 191 (Gardiner is a "required attendee" for a 4/10/8 meeting with GNC); 149 (Gardiner is a "required attendee" for a 5/6/08 meeting re: Bally's Health and Fitness); 150 (Gardiner is a "required attendee" for a 7/24/08 meeting to "discuss Prosource agreement"); 151 (Gardiner is a "required attendee" for an 8/6/08 meeting re: GNC Diet meeting); 152 (Gardiner is a "required attendee" for a 10/15/08 conference call with Fortunato); 206 (Gardiner is a "required attendee" for an 11/6/08 meeting with BB.com); 210 (Mike Canzoneri (VP of Sales at Iovate Sciences) asks whether Gardiner can meet regarding AAFES meeting in November of 2008); 213 (Gardiner listed as "required attendee" for daily meetings between 12/1/08-12/5/08 to develop and finalize all new innovation for upcoming GNC pitch); 212 (Gardiner confirms availability for 12/9/08 meeting with GNC); 87 (Marc Curcio, Channel Manager of Iovate Sciences, mentions that "EXEC" is meeting with Vitamin Shoppe on Thursday (2/5/09)); 156 (Gardiner is a "required attendee" for a 2/5/09 Vitamin Shoppe Executive Team visit); 113 (Gardiner listed as "Iovate attendee" at 3/31/09 GNC/Iovate business discussion meeting at GNC ); 119 (Gardiner invited to 4/14/09 meeting re: business

1  discussion between GNC/Iovate); and 115 (Gardiner invited to 5/1/09 meeting with Rite Aid and

2  brokerage firm).[2]

3      Gardiner was consulted and made decisions regarding many issues concerning the third-

4  party retailers.  Gardiner was consulted and involved in making decisions regarding, among

5  other things, contracts (on at least one occasion signing the contract on behalf of Iovate USA

6  even though Gardiner is not an officer or director of Iovate USA), the credit limit of customers,

7  sales initiatives, merchandising and promotion of Iovate products, and inventory and forecasting

8  problems.[3]  See, e.g., Pl. Exs. 215 (Begley instructs Alan Masson to get "final go ahead" from

9  Gardiner before sending GNC agreements for Hydroxycut Max and MuscleTech Halo); 31

10 (Gardiner signs a Supplier Agreement with Wal-Mart Stores, Inc. as "President" of Iovate USA

11 even though he does not hold any position with Iovate USA); 188 (Gardiner copied on email

12 attaching draft BB.com agreements); 85  (Begley emails Gardiner on 8/21/07, indicating that

13 he wants to discuss GNC's request for 70,000 bottles of bonus-size Hydroxycut Hardcore at

14 the same cost as the 210 count to support the January/February promotional.); 144 (Sportika

15 sends email to Gardiner and Begley requesting an increase in their credit limit - "Ultimately it

16 is Paul's money on the line . . . and you [Terry] need to feel comfortable and trust Rich White

17 _____

18     [2]  Kerr has filed "Objections and Request to Strike Evidence Offered in Support of
   Opposition to Consolidated Motion to Dismiss."  The Court does not "strike" evidence offered
19 in connection with motions.  Therefore the Court denies the request to strike.  As for the
   objections, Kerr has generally objected to most of the emails offered as evidence by Plaintiffs
20 on the grounds of hearsay and lack of personal knowledge. To the extent the Court relies on
   the emails offered as evidence, Kerr's objections to the emails are overruled. The emails
21 inviting Gardiner to a meeting, asking whether Gardiner is available for a meeting, or listing him
   as a required attendee are not hearsay. The emails show that Gardiner was deemed to be
22 someone who should attend the meeting in question.  Although the Court does not know that
   Gardiner attended all of these meetings, looking at the facts in a light favorable to Plaintiffs, it
23 can be inferred that Gardiner did attend many of these meetings.  Other emails are not hearsay
   because their significance derives from the type of information that is being requested or
24 provided, not whether the information is true.  Some of the emails also qualify as party
   admissions. The Court has no reason to believe that the authors of the emails lack personal
25 knowledge regarding the subject matter of the emails.

26     [3]  At one point, Fortunato of GNC even states, "I would like to see a broader dialog
   developing between Terry and Beth, which may negate the need for us to get embedded in
27 more day-to-day decision making, which would allow us to continue our high level strategic
   focus on continuing to build the relationship and elevate our already leadership position in both
28 our businesses."  (Pl. Ex. 202.)

09md2087

& Barry Griffing and allowing us the terms and limit he feels comfortable with."); 160 (Gardiner receives email from GNC explaining,[

**REDACTED**                    ]); 171 (in

an email to Fortunato of GNC, Gardiner talks about how the two of them previously discussed the need to improve inventory forecasting between GNC and Iovate to maximize every sales opportunity); 173 (Dean Pipher, Distribution Channel Manager at Iovate Sciences, requests a meeting with Gardiner, Begley and Vincent Scalisi (Chief Marketing Officer) to discuss a revised incentive and marketing program for BB.com); 174 (Begley emails Gardiner about inventory issues with GNC; Gardiner emphasizes the need to build forecasting relationships with the customers); 189 (Gardiner's approval is sought regarding various detailed sales initiatives relating to Empire Health and Hydroxycut Hardcore 120 caps);195 (Fortunato and Gardiner exchange e-mails regarding various items including reduction of PM's, in-store merchandising, extending a Xenadrine exclusive, and new products) 202 (Fortunato provides Gardiner with details regarding in-store and print promotions of Xenadrine, Max, and Hardcore); 203 (Gardiner emails Fortunato about 21 new products that are exclusive/preferred in 2009 and asks if GNC can aggressively promote them in the ways discussed on the phone); 221 (discussion between Gardiner and Pica regarding options on securing Rite-Aid AR balance); 224 (Gardiner asked to review and approve of note going out to GNC re: Premium Products Program);  241 (email from Marc Curio thanking Gardiner for his help and informing him of changes he is making to the "Wall Set" for Vitamin World ); 242 (Gardiner, Begley, and Canzoneri consulted re: Rite Aid's request to increase credit limit).

Gardiner monitored the significant accounts and requested and received information regarding the accounts in addition to information regarding the diet/nutritional supplement business of these retailers. See, e.g., Pl. Exs. 192 (Gardiner sent a cost/price analysis for bar category at AAFES per his request); 196 (Canzoneri confirms that he, Begley and Gardiner have agreed to pull GNC & Walmart accounts out of the monthly review process so that the accounts can be reviewed more regularly); 199 (Gardiner requests a detailed report on Vitamin Shoppe, including total sales, sales in sports category, sales in diet category, etc.); 211 (Begley

09md2087

assures Gardiner that Hydroxycut 60 CT Caffeine Free is the only Walmart item "short" and that he is "on it"); 214 (Begley explains to Gardiner the "late delivery" status of some Walgreens orders on a report - "I am ensuring we get orders like this out ASAP"); 225 (Gardiner copied on Team Direct's report re: Iovate's position with respect to Wal-Mart and the diet category).

It appears that Gardiner closely tracked sales, receiving sales reports by product in addition to point-of-sale reports per customer.  Gardiner received weekly as well as daily reports. (Pl. Exs. 95, 97 98, 99, 100, 101, 103, 104, 105, 106,107, 110, 137, 143, 155.)

Gardiner met with manufacturers, was involved in negotiations with manufacturers, and was kept up-to-date regarding manufacturing costs.  See, e.g., Pl. Exs. 254 (pricing proposal from HVL sent to Gardiner, Begley, and Michael Bedrosian explains that the deal is a simple, straight-forward deal "since Paul did not like the rebate concept"); 79 (an Iovate employee emails Gardiner regarding negotiations regarding Hydroxycut Sachet costs); 80 (Gardiner copied on an email from Begley explaining the status of his pricing discussions with Interhealth); 81 (Begley copies Gardiner on email regarding pricing discussions with Interhealth);142 (Gardiner sent a 2007/2008 comparison of costs of certain products); 157 (Pica and Jay Shoemaker request a meeting with Gardiner regarding Interhealth); 218 (per Gardiner's request, he is sent information regarding Creakic and Hardcore costs); and 239 (Gardiner is a "required attendee" for a 10/29/07 meeting with Interhealth regarding purchasing trends for Super Citrimax, a raw ingredient used in a variety of products produced by Iovate).

Gardiner was also involved in and informed about the pricing of products, budgets, costs, and expenses, and accounts receivable.  See, e.g., Pl. Exs. 129 (Gardiner listed as a "required attendee" at a 9/8/08 meeting to review pricing options for the two RTDs (ready-to-drinks)); 237 (per Gardiner's request, he is sent a distributor price list for December 2007); 158 (Gardiner is provided with information regarding research and development budget and expenses); 166 (Gardiner is a "required attendee" for a 10/15/07 meeting regarding reducing the cost of "Top Iovate Brands" by 10%); 155 (Gardiner is sent an update regarding AR activities over the past week).

09md2087

1    Gardiner participated in the review of new products, formulas, and packaging, and was

2    involved in decisions regarding the continuation of existing products, finalization of products,

3    and approval of labels.  See, e.g. Pl. Exs. 84 (Gardiner invited to 10/4/07 meeting to finalize

4    Hydroxycut White Box, and the Six Star brands); 200 (Scalisi wants to show Gardiner samples

5    of Hydroxycut Max Drink Mix Box); 89 (in an email to Gardiner, Jonathan Coyne, and Darren

6    Contardo, Begley discusses Coyne's report re: flavors of the Hydroxycut Hardcore drink and

7    states his opinion that the third flavor should be grape); 116 (Gardiner invited to March 4, 2009

8    meeting re: "Hydroxycut Shots continue Yes or No"); 122 (Gardiner is a "required attendee" for

9    a 10/2/07 meeting to review final formulas and labels for Hydroxycut Max, MAP Torment, &

10   Halo); 124 (Gardiner is a "required attendee" for a 9/14/07 meeting re: Hydroxycut current and

11   new formulations and packaging); 128 (Gardiner is a "required attendee" for a 6/25/08 meeting

12   re: new Hydroxycut Hardcore Formula review); 140 (Gardiner is a "required attendee" at a

13   2/12/08 meeting re: finalization of MASS-Tech Hardcore formulas); 219 (Gardiner is a "required

14   attendee" for 1/23/09 meeting re: new diet products); 234 ("Labels for Hydroxycut 60, 100 and

15   150 count have been recirculated today and should be up for exec signoff later").

16   Gardiner also took part in other miscellaneous aspects of the Iovate Companies'

17   operations.  For example, Gardiner was consulted and invited to meetings regarding

18   commercials. See, e.g., Pl. Exs. 114 (Gardiner is invited to an 11/24/08 meeting re: "review

19   outline for the Miami shoot re: Hydroxycut and Xenadrine"); 226 (Gardiner is a "required

20   attendee" at an 11/2/07 meeting to watch competitive diet commercials); 243 (Scalisi sends

21   Gardiner and Begley an updated version of the Spanish Language Hydroxycut commercial and

22   asks for their thoughts as soon as possible).  Gardiner was involved in warehousing issues.

23   See, e.g, Pl. Exs. 163 (Brian Hogan sends Gardiner and Begley a warehouse space breakdown

24   pursuant to their prior discussion at the warehouse); 169 (Gardiner and Begley are "required

25   attendees" for a 10/11/07 warehouse consultant visit by Kuehne + Nagel Inc.). Gardiner also

26   monitored inventory and forecast accuracy.  See, e.g., Pl. Exs. 217 (Gardiner sends an email

27   stating that the out-of-stock situation and terrible forecasting has cost the company millions of

28   dollars and calls for a meeting with solutions); 77 (Gardiner states that he would like to review

09md2087

forecast accuracy at the next meeting and would like to see a report on the forecast accuracy on a "SKU" by "SKU" basis and the average percentage the company is off by SKU for each of the past 5 months; he also wants to track how they are improving month by month); 162 (Gardiner is sent Short Ship Report for November 14, 2008); 179 (Begley tells Gardiner that he will keep Gardiner informed regarding an issue involving a number of products "out of stock"); 183 (Begley forwards to Gardiner email string regarding a report on excess and slow moving inventory); 201 (Begley forwards to Gardiner email regarding inventory of Citrimax).

**5.** __Kerr's Characterization of its Business and How it Has Held Itself out to the Public__

Kerr changed its name from "Iovate Health Sciences Group, Inc." to "Kerr Investment Holding Corp." in 2009. The corporate resolution to change the name was signed by Gardiner and was dated April 29, 2009. (Pl. Ex. 24.) April 29, 2009, is also the day that the FDA informed counsel for Kerr that it had concluded that Hydroxycut products present a severe potentially life-threatening hazard to some users and explained what actions the FDA expected Kerr to take in response. (Pl. Ex. 244.)

Prior to the name change, in audited financial statements, Kerr was described as a company that "sells advanced nutritional supplements throughout Canada, the United States, and internationally." (Pl. Ex. 69, Kerr 3139; 70, Kerr 3155, 72, Kerr 3187; 73, Kerr 3201, 74, Kerr 3215.) [                    **REDACTED**

](Pl. Ex. 40 Kerr 2060). After the name change, the financial statements stated that Kerr "operates as a holding company" and that "Kerr's subsidiaries . . . are engaged in the research, development, marketing and distribution of dietary supplements in the sports nutrition, weight loss, metabolism, health and wellness industries." (Pl. Ex. 71, Kerr 3171). [                    **REDACTED**

] (Pl. Ex. 45, Kerr 2306; Pica Dep. 175:19-23.)

09md2087

1    For some period of time, a hydroxycut.com website was maintained by the Iovate

2    Companies.[4]   This website  had a "Terms of Use" section that stated "The website

3    Hydroxycut.com . . . is owned and operated by Iovate Health Sciences Group, Inc., maker of

4    the MuscleTech brand of products."   The website provided information about various

5    Hydroxycut products.  The website also included links to on-line retailers that sold the products.

6    The parties dispute whether the archived webpages have been properly authenticated

7    by Plaintiffs.  Although Plaintiffs were able to obtain a declaration from the Office Manager of

8    the Internet Archive regarding how the archive receives and archives data, the Internet Archive

9    was unable to confirm that the pages printed off by Mr. McFarlane match the archived data

10   because the operator of the site had uploaded a robots.txt.file, which bars access to the site.

11   (Ex. A to McFarlane Decl. in opp. to objections.)

12   However, the Court need not decide whether the archived webpages have been

13   sufficiently authenticated.   The Court takes judicial notice of the filings in the <u>Eaves v.</u>

14   <u>Muscletech Research</u> case in the District of Minnesota.  In that case, in opposition to a motion

15   to dismiss for lack of personal jurisdiction filed by Kerr (then "Iovate Health Sciences Group,

16   Inc.") and other Iovate entities, plaintiff submitted screen shots of the hydroxycut.com website,

17   which was apparently active at the time.  (Ex. C to Decl of Benjamin R. Skjold [Case No.

18   05cv978 ADM/AJB - Doc. No. 66]).  In their reply in support of the motion to dismiss for lack of

19   personal jurisdiction, the Iovate defendants essentially admitted that the screen shots were

20   authentic and that Iovate Health Sciences Group, Inc., passively owned two websites -

21   hydroxycut.com and muscletech.com.  (Iovate Defendants' Reply [Doc. No. 93].)  The Iovate

22   defendants argued:

23

24   _____

25   [4] Plaintiffs submitted screen shots of archived webpages from hydroxycut.com obtained from archive.org (http://web.archive.org/web/*/http://hydroxycut.com). (Pl. Ex. 249).  Plaintiffs'

26   counsel, John McFarlane accessed the archived webpages from archive.org on March 23, 2010.  (McFarlane Decl. in Opp. to Kerr's Objections, ¶ 2.)  In addition, Plaintiffs submited an

27   Affidavit of Benjamin R. Skjold, filed in <u>Eaves v. Muscletech Research</u>, 05cv978 ADM/AJB (D. Minn.) on August 12, 2005, which attached similar screen shots from hydroxycut.com (it

28   appears that hydroxycut.com was an operating website at the time those screen shots were taken).  (Ex. C to McFarlane Decl. in Opp. to Kerr's Objections.)

> First and foremost, the evidence presented by Plaintiff indicates that the only reference to Iovate HSG [Iovate Health Sciences Group, Inc.] in the hydroxycut.com and muscletech.com web sites is in the 'terms of use' section, where it states that Iovate HSG is the owner and operator of the web sites (i.e., the registrant).  Otherwise, the sites are exclusively devoted to MuscleTech and products sold by MuscleTech.  At best, Plaintiff has only shown that Iovate HSG's role is simply that of a passive owner whose electronic signals may have been transmitted anywhere in the world.  This is insufficient.

(Iovate Defendants' Reply at 4.)   The Iovate defendants argued that the hydroxycut.com web site was "only an informational website" that did not engage in direct sales activity and did not support jurisdiction over Iovate Health Sciences Group, Inc.  (Iovate Defendants' Reply at 7.)

For purposes of this motion, the Court is satisfied that the hydroxycut.com screen shots filed as exhibits in <u>Eaves</u> are authentic representations of the website as it existed at that time.  The Court also overrules Kerr's hearsay objection.  Because the screen shots are deemed to be authentic representations of portions of the hydroxycut.com website, statements made by Kerr therein are party admissions.

## B. AGENCY

### 1. Agency Principles

An agency relationship, like an alter ego relationship, "is typified by parental control of the subsidiary's internal affairs or daily operations."  <u>Doe, I, v. Unocal Corp.</u>, 248 F.3d 915, 926 (9th Cir. 2001).[5]  In determining whether a subsidiary acts as an agent of the parent, courts typically look to see whether the parent's control of the subsidiary is so pervasive that the subsidiary can fairly be deemed a means through which the parent acts or an incorporated division of the parent.  The control must go beyond the general executive control that a parent

_____

[5]  The Court applies principles of agency that are common to many jurisdictions.  The Court does not engage in a forum-by-forum analysis because it is not clear which states' laws on the issue of agency apply to the numerous cases before the Court.  The parties have not engaged in a choice-of-law analysis (applying the choice-of-law rules of the forum in which each case was originally filed), and the Court declines to tackle such a task itself.

09md2087

1    normally exercises over a subsidiary; the control must be on the level of day-to-day operational

2    control.[6]

3         Some courts consider non-exclusive factors to aid their analysis regarding the degree

4    of the parent's control.  For example, Delaware courts consider the extent of overlap of officers

5    and directors, methods of financing, the division of responsibility for day-to-day management,

6    and the process by which each corporation obtains its business.  Japan Petroleum Co. (Nigeria)

7    Ltd. v. Ashland Oil, Inc., 456 F. Supp. 831, 841 (D. Del. 1978).   New Jersey courts consider:

8    (1) whether the subsidiary is doing business in the forum that would otherwise be performed

9    by the parent; (2) whether there is common ownership of the parent and subsidiary; (3) whether

10   there is financial dependency; and (4) whether the parent interferes with the subsidiary's

11   personnel, disregards the corporate formalities, and/or controls the subsidiary's marketing and

12   operational policies.  Dewey v. Volkswage AG, 558 F. Supp. 2d 505, 513 (D.N.J. 2008).  See

13   also Tridont Leasing (Canada) Limited v. Saskatoon Market Mall Ltd., 1995 CarswellSask 75

14   _____

15       [6] See, e.g., Sonora Diamond Corp. v. Superior Court, 83 Cal. App. 4th 523, 541 (2000)
     ("Accordingly, if a parent corporation exercises such a degree of control over its subsidiary
16   corporation that the subsidiary can legitimately be described as only a means through which
     the parent acts, or nothing more than an incorporated department of the parent, the subsidiary
17   will be deemed to be the agent of the parent in the forum state and jurisdiction will extend to
     the parent."); Applied Biosystems, Inc. v. Cruachem, Ltd., 772 F. Supp. 1458, 1463 (D. Del.
18   1991) ("The agency theory . . . examines the degree of control which the parent exercises over
     the subsidiary."); Development Corp. of Palm Beach v. WBC Construction, LLC, 925 So.2d
19   1156 (Fla. App. 2006) (the amount of control exercised by the parent must be to the extent that
     the subsidiary "manifests no separate corporate interests of its own and functions solely to
20   achieve the purposes of the dominant corporation.") (internal quotation marks and citation
     omitted); Sol Melia, SA v. Brown, 688 S.E.2d 675 (Ga. App. 2009) (exercise of personal
21   jurisdiction over a parent is proper if the parent's control over the subsidiary's activities is so
     complete that the subsidiary is, in fact, merely a division or department of the parent); Old
22   Orchard Urban Ltd. P'ship v. Harry Rosen, Inc., 904 N.E.2d 1050, 1059 (Ill. App. 2009) (the
     critical question with respect to agency is whether the subsidiary "exists for no purpose other
23   than conducting the business of its parent");   Ross v. First Savings Bank of Arlington, 675
     N.W.2d 812, 819 (Iowa 2004) (explaining that the  "agent must act in the forum state under the
24   control of the nonresident principal"); Gordon v. Greenview Hosp., Inc., 300 S.W.3d 635, 653
     (Tenn. 2009) (agency analysis "hinges on the right to control the agent's actions . . . and,
25   ultimately, the fact of actual control over the agent");  Greenfield Energy, Inc. v. Duprey, 252
     S.W.3d 721 (Tex. App. 2008) (explaining that the pertinent inquiry was whether the parent
26   company or sole shareholder controlled the means and details of the subsidiaries' activities);
     Tridont Leasing (Canada) Limited v. Saskatoon Market Mall Ltd., 1995 CarswellSask 75 (Sask.
27   Ct. of App. 1995) ("The courts have also pierced the corporate veil when one company is so
     dominated by another that even though they are separate in law, one is so controlled by the
28   other that both corporations constitute one common unit.")

09md2087

(Sask. Ct. of App. 1995) (applying Canadian law and considering the following factors: (1) whether the profits were treated as profits of the parent or subsidiary; (2) whether the individuals involved in the day-to-day operations were appointed by the parent; (3) whether the parent corporation was the "brains" behind the day-to-day operation; (4) whether the parent corporation made policy and financial decisions that were merely carried out by the subsidiary; (5) whether the profits were directly traceable to the skill and direction of the parent; and (6) whether control by the parent was constant or merely periodic and long range.).

Under the laws of a number of states, a subsidiary is deemed to be acting as the agent of the parent if the subsidiary engages in activities that, but for the existence of the subsidiary, the parent would have to undertake itself.[7]  Courts have found subsidiaries to be acting as the agent of a parent where the subsidiary is a crucial part of what is, in essence, a single business enterprise with the parent at the healm.  For example, in Bulova Watch Company, Inc. v. K. Hattori & Co., Ltd., 508 F. Supp. 1322 (E.D.N.Y. 1981), Hattori was a Japanese company which, among other things, contracted for the manufacture of watches and then sold its watches under the Seiko, Pulsar, and other brands to three American subsidiaries.  The American subsidiaries in turn sold the Seiko-branded products to retail customers and wholesale distributors in the Carribean, South America and Europe.  The court found that the New York subsidiaries, whose sole purpose was to market single product timepieces, were the means by which Hattori established and sought to maintain its base in the country that was its single largest export market.  The significance of the subsidiaries in Hattori's "organizational life"

---

[7] See, e.g., Sonora Diamond, 83 Cal. App. 4th at 542 (describing the "representative services" doctrine as applying where the subsidiary performs services sufficiently important to the parent that if it did not have a representative to perform them, the parent would have to undertake such activities itself); Patterson v. Home Depot, 684 F. Supp. 2d 1170, 1180-81 (D. Ariz. 2010) (applying "but for" test); Seltzer v. I.C. Optics, Ltd., 339 F. Supp. 2d 601, 609 (D.N.J. 2004); Bulova Watch Co., Inc. v. K. Hattori & Co., Ltd., 508 F. Supp. 1322, 1344 (E.D.N.Y. 1981) ("The subsidiaries do for the parent everything that the parent would have to do if it were here directly . . . ."); Gallagher v. Mazda Motor of America, Inc., 781 F. Supp. 1079, 1083-84 (E.D. Pa. 1992) (explaining that if a subsidiary performs functions that the parent would otherwise have to perform, the subsidiary then functions as "merely the incorporated department of its parent."); In re Telectronics Pacing Sys., Inc., 953 F. Supp. 909, 919 (S.D. Ohio 1997) ("Another way to view the attribution theory of jurisdiction is to look to see if the 'parent uses the subsidiary to do what it otherwise would have done itself.'") (quoting Gallaher, 781 F. Supp. at 1085).

09md2087

was enormous because the export market accounted for 60% of Hattori's production.  The court explained:

> The subsidiaries do for the parent everything that the parent would have to do if it were here directly: if the New York subsidiaries did not advertise Hattori's products . . . Hattori would; if the New York subsidiaries did not provide service quality control centers, Hattori would, . . . and if the subsidiaries did not develop the marketing techniques to penetrate and expand their share of the American market, Hattori would.

Id. at 1344.  See also Dorfman v. Marriot Int'l Hotels, Inc., 2002 WL 14363 (S.D.N.Y. Jan. 3, 2002) (holding that Otis Felvonó, which sold, installed, and maintained Otis Elevator products in Hungary, was an agent of Otis Elevator because Otis Felvonó functioned as an integral part of a united endeavor - a worldwide business in manufacturing, selling, installing, and servicing elevators and similar products).

Courts hold that the relationship between a *true* holding company and its subsidiary is not an agency relationship.  As explained by the Southern District of New York:

> Where a holding company is nothing more than an investment mechanism a device for diversifying risk through corporate acquisitions the subsidiaries conduct business not as its agents but as its investments. The business of the parent is the business of investment, and that business is carried out entirely at the parent level. Where, on the other hand, the subsidiaries are created by the parent, for tax or corporate finance purposes, to carry on business on its behalf, there is no basis for distinguishing between the business of the parent and the business of the subsidiaries. There is a presumption, in effect, that the parent is sufficiently involved in the operation of the subsidiaries to become subject to jurisdiction.

Bellomo v. Pennsylvania Life Co., 488 F. Supp. 744, 746 (S.D.N.Y 1980).

In Bellomo, the court held that based on the record before it, Pennsylvania Life Company was not merely a passive investor, but, rather, was a "super-corporation engaged primarily in underwriting and selling a variety of insurance policies through several subsidiaries."  Id. at 747. Therefore, the court concluded, the plaintiff had established a prima facie case that the New York subsidiaries were doing business in New York as the agents of Pennsylvania Life.  Id.

In contrast, in F. Hoffman-La Roche, Ltd. v. Superior Court, 130 Cal. App. 4th 782, 802 (2005), the California Court of Appeal held that Roche Holding was a "true passive holding company" that globally invested in pharmaceutical subsidiaries and had no exercise or operational control whatsoever over the subsidiaries.  Similarly, in Sonora Diamond, 83 Cal.

09md2087

App. 4th at 543-45, the California Court of Appeal held that Sonora Diamond Corp. was a holding company whose business was not mining but, rather, its investment in Sonora Mining.

### 2. <u>Application of Agency Law to the Facts of this Case</u>

Plaintiffs have established a prima facie case that Iovate USA acted as an agent for Kerr. But for the existence of Iovate USA, which sells the Hydroxycut products, Kerr would have to perform those functions itself or through another company. Iovate USA's activities are crucial to the unified business of Kerr and its subsidiaries – i.e., the development, marketing, and distribution of diet and nutritional supplements. Furthermore, Plaintiffs have presented facts that indicate that Kerr, through Gardiner, exerted day-to-day operational control over Iovate USA to the extent that Iovate USA can fairly be deemed an incorporated division of Kerr.

### a. <u>"But for" Test</u>

Kerr contends that it is nothing but a holding company that invests in its subsidiaries. However, the facts of this case tend to show that Kerr was in the business of developing and selling diet and nutritional supplements and that all of its subsidiaries played essential roles in carrying out this business.

The Iovate Companies are set up so that each subsidiary performs specific services related to the development and sales of diet and nutritional supplements. Iovate USA buys product from Iovate International and then sells the product to third party retailers. Iovate International procures the product sold by Iovate USA through contracts with third-party manufacturers. Iovate Research provides research and development services. The formulation companies hold the patents and formulations for the products, and the "trademark" companies hold trademarks for the products created by the company. Iovate Sciences provides administrative services to the companies. Kerr and Gardiner own all of the stock of these subsidiaries.

It is clear that one business enterprise has been divided into numerous parts that work together and depend on each other. All of the functions of the subsidiaries are devoted to the

09md2087

1  common end of developing and selling the Iovate Companies' diet and nutritional supplements.

2  The subsidiaries do not engage in any other business.  Iovate USA sells Iovate products only.

3      Thus, the services of all of the subsidiaries are essential to the Iovate Companies'

4  unitary enterprise.  Iovate USA's activities are particularly crucial to the success of the business.

5  As in Bulova Watch, supra, where the sole purpose of the American subsidiaries was to market

6  Hattori's watches, Iovate USA is the means by which Kerr establishes and maintains a

7  presence in the American market.  Iovate USA's sales make up almost all of the Iovate

8  Companies' income (94% of the Iovate Companies' aggregate net sales in 2007 and 97% of

9  the aggregate net sales in 2008).

10      Significantly, all of the non-sales efforts of Kerr's subsidiaries – research, protection of

11  copyrights and trademarks, contracting with manufacturers, and marketing – are geared toward

12  the ultimate sale of the products and realization of profit. In Sonora Diamond, the California

13  Court of Appeal noted that the outcome of its agency analysis may well have been different if

14  Diamond, the parent company, had owned the rights to the gold that was being mined by the

15  subsidiary:

16      Had Diamond, for example, owned the rights to the gold and used Sonora Mining
       as the operating and marketing entity, perhaps general jurisdiction over Diamond

17      would be proper under the representative services rationale, because *Diamond
       in that situation could not reap the benefits of its rights unless it or someone else*

18      *removed and sold the ore*. Neither this circumstance, nor any analogous one, is
       present in the record of this case. Diamond was not engaged in the mining

19      business and owned nothing but the stock of Sonora Mining. Diamond's business
       was investment only.

20
21  83 Cal. App. 4th at 545.  (Emphasis added.)  There is no doubt that if Iovate USA did not

22  perform its sales functions, Kerr, by itself or through a different company, would have to take

23  on that role to reap the benefits of the enterprise.

24      Kerr is not a "true holding company" that simply invests in different companies.   It

25  appears that the "subsidiaries [were] created by the parent, for tax or corporate finance

26  purposes, to carry on business on its behalf."  Bellomo, 488 F. Supp. at 746.   [

27              **REDACTED**                              ].  The fact that Kerr owned

28

1  and operated a website that advertised Hydroxycut products is further proof that  Kerr was not

2  a disinterested investor with no involvement in its subsidiaries' activities.[8]

3      The Court concludes that Plaintiffs have made a sufficient showing that Iovate USA was

4  acting as an agent of Kerr under the "but for" theory.

6      **b.  Control Test**

7      In addition to satisfying the "but for" test, Plaintiffs have made a prima facie showing that

8  Kerr, through Gardiner (who is the 100% owner of Kerr as well as its sole officer and director),

9  controlled the daily operations of Iovate USA and the other subsidiaries.  The facts show that

10  Kerr's control went well beyond the normal executive control exercised by a parent.

11      Kerr and the subsidiaries are commonly owned by Gardiner.  The operational

12  subsidiaries are financially dependent on Kerr in that Kerr provides working capital to them via

13  a revolving capital credit facility with the Royal Bank of Canada.  In addition, Kerr "reinvested"

14  funds that it had borrowed from the Employee Profit Sharing Plan into the subsidiaries.  The

15  profits generated from Iovate USA's sales are not treated as Iovate USA's own, but, rather, are

16  funneled down into the formulation companies and then paid into the Plan.  Gardiner is the only

17  "participating employee" in the Plan.  Although the bonuses may have been reinvested into the

18  companies, it appears that Gardiner had control over the funds.

19      Furthermore, as described in detail in the "Facts" section of this Order, Gardiner was

20  intimately involved in all facets of the Iovate Companies' enterprise of developing, marketing,

21  and distributing diet and nutritional supplements.  Gardiner played an active role in the day-to-

22  day operations of the subsidiaries.

23      Gardiner met with manufacturers. He was also involved in negotiations with

24  manufacturers, and remained informed regarding manufacturing costs.

27      [8]  The Court notes that although it gives the website brief consideration in connection
   with its analysis of the true nature of Kerr's business, the Court does not rely on the website
28  for purposes of establishing minimum contacts through purposeful availment.

09md2087

1    Gardiner was involved in the review of new products, formulas, and packaging, and was

2    involved in decisions regarding the continuation of existing products, finalization of products,

3    and approval of labels.  It appears that Gardiner's approval was necessary for new product

4    labels.  See, e.g., Pl. Ex. 234 ("Labels for Hydroxycut 60, 100, and 150 count have been

5    recirculated today and should be up for exec signoff later.").

6    Gardiner kept a close eye on the financials of the Iovate Companies.  He received

7    weekly as well as daily sales reports.  He apparently exercised care when reviewing the reports,

8    on one occasion commenting that the sales on the graphs of a Walgreens POS report were

9    wrong and were wrong in the report sent out the two weeks before as well.  (Pl. Ex. 97.)  He

10   was also involved in and informed about the pricing of products, budgets, costs and expenses,

11   and accounts receivable.

12   Gardiner was especially involved in the relationships between Iovate USA and third-party

13   retailers such as GNC and Walmart.   It appears that Gardiner's approval was needed for

14   agreements between Iovate USA and third-party retailers.  See, e.g., Pl. Exs. 215 (Begley

15   instructs Masson to get "final go ahead" from Gardiner before sending GNC agreements for

16   Hydroxycut Max and MuscleTech Halo); 188 (Gardiner copied on email attaching draft BB.com

17   agreements).  On at least one occasion, Gardiner actually signed an agreement for Iovate USA

18   even though Gardiner is not a director or officer of Iovate USA.  (Pl. Ex. 31 - Gardiner signs a

19   Supplier Agreement with Wal-Mart Stores, Inc. as "President" of Iovate USA).

20   Gardiner personally met and interacted with representatives of the retailers and

21   communicated with them regarding details of their accounts, including financing, pricing,

22   promotions, merchandising, inventory forecasting, and new products.  At one point, Joe

23   Fortunato of GNC complained that he and Gardiner were too enmeshed in day–to–day

24   operations: "I would like to see a broader dialog developing between Terry and Beth, which may

25   negate the need for us to get embedded in more day-to-day decision making, which should

26

27

28

09md2087

1   allow us to continue our high level strategic focus on continuing to build the relationship and

2   elevate our already leadership position in both our businesses."  (Pl. Ex. 202.)[9]

3        Within the Iovate Companies, Gardiner was consulted and made decisions regarding

4   various issues affecting the retailer relationships, including increasing credit limits, product

5   promotions, marketing, and sales initiatives.  Gardiner even provided input regarding product

6   displays in stores. (Pl. 241 - Marc Curio thanks Gardiner for his help and tells him about the

7   changes he will make to the Wall Set for Vitamin World).

8        Gardiner was also involved in advertising decisions.  For example, Gardiner and two

9   other individuals were invited to a November 24, 2008 meeting to review the outline for "the

10  Miami Shoot re: Hydroxycut & Xenadrine." (P. Ex. 114.)  On January 10, 2008, Vincent Scalisi,

11  Chief Marketing Officer, asked Gardiner and Begley to review and give their comments on an

12  updated version of the Spanish language Hydroxycut commercial.  (Pl. Ex. 243.)

13       In sum, the facts establish that Gardiner was deeply involved in the details of the Iovate

14  Companies' business, particularly with respect to the accounts of Iovate USA.  Gardiner

15  vigilantly monitored the finances of the companies, took action when problems such as forecast

16  accuracy arose, and exercised his authority as to all significant aspects of the subsidiaries'

17  operations.

18       Kerr argues that Gardiner's involvement in the business activities of Iovate USA was

19  pursuant to Iovate USA's Services Agreement with Iovate Sciences.  Under the Services

20  Agreement, Iovate Sciences agreed to provide "strategic planning and executive management,"

21  including the provision of "operational, financial and strategic management for Company." (Pl.

22  Ex. 26, Kerr 718.)  Gardiner is the CEO and Director of Iovate Sciences.

23       The Court is not persuaded by Kerr's argument.  The level of Gardiner's involvement in

24  Iovate USA's operations went beyond "executive management."  Gardiner did not just provide

25  oversight and management - he was immersed in the day-to-day operations of Iovate USA.

26

27  _____

28       [9]  Kerr's hearsay objection to this email is overruled.  The Court considers the email for
     Fortunato's state of mind as to his wish to disengage from day-to-day affairs.

1    Kerr cannot use the Services Agreement to justify the degree of Gardiner's participation in

2    Iovate USA's operations.

3         Through Gardiner, Kerr exercised pervasive control over Iovate USA's operations to the

4    extent that Iovate USA can be viewed as an incorporated division of Kerr or the means through

5    which Kerr conducted its business.  Accordingly, for purposes of the instant motions,  the Court

6    considers Iovate USA to be an agent of Kerr.

7

8    **C. Alter Ego**

9

10        **1. Alter Ego Principles**

11        In order to pierce the corporate veil between a parent and subsidiary under the alter ego

12   theory, the plaintiff must show (1) that there is such a unity of interest and ownership between

13   the parent and subsidiary that the separate personalities of the entities no longer exists; and

14   (2) failure to disregard the corporate forms would result in fraud or injustice.  Doe I, 248 F.3d

15   at 926; Sonora Diamond, 83 Cal. App. 4th at 539; Mason v. Network of Wilmington, Inc., 2005

16   WL 1653954, at * 2 (Del. Ch. July 1, 2005).[10]

17

18        [10]  It appears that most states have similar requirements for establishing alter ego.  See
     Joint Supp. Statement, 17, Kerr App. 1 & 2.  For purposes of streamlining this discussion, the
19   Court cites primarily to California and Delaware cases regarding alter ego.  It appears that
     under the choice-of-law rules of the majority of the forums at issue, the forums look to the alter
20   ego law of the state of incorporation of the alleged alter ego entity - in the case of Iovate USA,
     Delaware.  Accordingly, in most of the cases, the governing law on the issue of whether Iovate
21   USA is the alter ego of Kerr is Delaware law and/or the laws of the forum state to the extent
     that they do not conflict with Delaware law.  See Trans-World Int'l, Inc. v. Smith-Hemion Prod.,
22   Inc., 972 F. Supp. 1275, 1291 (C.D. Cal. 1997) (explaining that there was no real conflict of law
     because "both Delaware and California examine similar factors in determining whether an
23   individual or corporation is the alter ego of another corporation," and performing an analysis
     under both Delaware and California law); Hitachi Med. Sys.America, Inc. v. Branch, 2010 WL
24   816344, at *5-6 (N.D. Ohio 2010) (analyzing both Ohio and Delaware law on the issue of alter
     ego and concluding that the laws of the state do not conflict); Charter Services, Inc. v. DL Air,
25   LLC, 711 F. Supp. 2d 1298, 1306 n. 13 (S.D. Ala. 2010) (applying Delaware law as to Plaintiffs'
     alter ego claims because under Alabama law veil-piercing issues are determined by reference
26   to the law of the state under which the corporation exists); Acciai Speciali Terni USA, Inc. v.
     Momene, 202 F. Supp. 2d 203, 207 (S.D.N.Y. 2002) (applying Delaware law as a result of New
27   York's choice-of-law principles that "the law of the state of incorporation determines when the
     corporate form will be disregarded and liability will be imposed on shareholders"); In re Dodgin,
28   2006 WL 3069714, * 5 (Bankr. N.D. Tex. Oct. 26, 2006) (applying New Mexico law in

California courts consider a number of alter ego factors, including but not limited to: the commingling of funds and other assets; identical equitable ownership in the two entities; observation of corporate formalities and the segregation of corporate records; use of the same offices and employees; identity of directors and officers; sole ownership of all of the stock in a corporation by one individual or the members of a family; inadequate capitalization; failure to maintain arm's length relationships among the related entities; the use of a corporation as a mere shell, instrumentality or conduit for a single venture or the business of an individual or another corporation; and the manipulation of assets and liabilities between entities so as to concentrate the assets in one and the liabilities in the other.  Associated Vendors, Inc. v. Oakland Meat Co., Inc., 210 Cal. App. 2d 825, 838-40 (1962).

Delaware courts similarly consider factors including "whether the corporation was adequately capitalized for the corporate undertaking; whether the corporation was solvent; whether dividends were paid, corporate records kept, officers and directors functioned properly, and other corporate formalities were observed; whether the dominant shareholder siphoned corporate funds; and whether, in general, the corporation simply functioned as a facade for the dominant shareholder."  United States v. Golden Acres, Inc., 702 F. Supp. 1097, 1104 (D. Del. 1988).

Both California and Delaware require some form of misconduct or injustice to justify piercing the corporate veil.  "An overall element of injustice or unfairness must always be present, as well."  Golden Acres, 702 F. Supp. at 1104.  Although actual fraud is not required, "bad faith in one form or another is an underlying consideration."  Associated Vendors, 210 Cal. App. 2d at 838.  Mere difficulty in enforcing a judgment or collecting a debt does not satisfy the requirement for misconduct or injustice.  Sonora Diamond Corp., 83 Cal. App. 4th at 537.

---

determining whether to pierce the corporate veil of a New Mexico corporation).  Because the Court finds that Plaintiffs have made a prima facie showing that Iovate USA is the alter ego of Kerr, the Court need not examine Canadian law for purposes of determining whether the corporate veil of the other subsidiaries should be pierced.

09md2087

## 2. <u>Application of Alter Ego Principles to the Facts of This Case</u>

The same facts that support the conclusion that Iovate USA acted as an agent of Kerr also support a finding of alter ego. The critical issue here is the degree of control Kerr exercised over Iovate USA's daily operations. "An alter ego or agency relationship is typified by parental control of the subsidiary's internal affairs." <u>Doe I</u>, 248 F.3d at 926.

The Court is not persuaded by all of Plaintiffs' alter ego arguments. Based on the record before it, the Court cannot conclude that Kerr and Iovate USA disregarded corporate formalities, mingled records, or commingled funds. In addition, the fact that Gardiner's approval may have been needed for major expenditures is of little significance. <u>See Doe I</u>, 248 F.3d at 927 (citing cases holding that parental approval of major capital expenditures do not support alter ego liability); <u>Dorfman</u>, 2002 WL 134363, at * 9 (same).

The Court also does not find that Iovate USA was inadequately capitalized.[11] [

**REDACTED**

]. Although Iovate USA's capital may not have been enough to satisfy multi-million dollar judgments, the capital was sufficient for Iovate USA to operate its normal business. <u>See Laborers Clean-Up Contract Admin. Trust Fund. v. Uriate Clean-Up Service, Inc.</u>, 736 F.2d 516, 524 (9th Cir. 1984) (explaining that a corporation is undercapitalized when it is unable to meet debts that may reasonably be expected to arise in the normal course of business); <u>Sheppard v. River Valley Fitness One, L.P.</u>, 2002 WL 197976, at * 12 (D.N.H. 2002) ("But the proper measure of the sufficiency of a corporate entity's capitalization is not whether it can pay a potential judgment in a lawsuit but, rather, whether it had sufficient assets to meet the obligations incurred by conducting ordinary business in the industry in which it operates.").

However, as explained in the agency discussion, Plaintiffs have made a prima facie showing that Kerr, through Gardiner, dominated and controlled Iovate USA to the extent that Iovate USA could fairly be deemed a mere conduit for Kerr's sales operations or a facade for

---

[11] Under California law, inadequate capitalization of a subsidiary may alone be a basis for holding the parent corporation liable for the acts of its subsidiary. <u>Slottow v. American Cas. Co. of Reading, Pennsylvania</u>, 10 F.3d 1355, 1360 (9th Cir. 1993).

09md2087

1   Kerr.  See Doe I, 248 F.3d at 926 ("[W]here a parent corporation uses its subsidiary 'as a

2   marketing conduit' and attempts to shield itself from liability based on its subsidiaries' activities,

3   piercing the corporate veil is appropriate and the alter-ego test is satisfied.")  As structured, the

4   subsidiaries relied on Kerr for financing their operations, and profits derived from the

5   companies' efforts were directed into the Plan in which Gardiner was the sole participant.

6   Furthermore, Gardiner, sole owner of Kerr and the subsidiaries, exercised pervasive domination

7   and control over the subsidiaries, especially Iovate USA, involving himself in their day-to-day

8   operations.  See Rollins Burdick Hunter of Southern California, Inc. v. Alexander & Alexander

9   Serv., 206 Cal. App. 3d 1, 11 (1988) (exercising personal jurisdiction over grandparent

10  corporation because the grandparent exercised complete domination and control over the

11  California corporation - "Every facet of its business – from broad policy decisions to routine

12  matters of day-to-day operation  – appears to have been dictated by A&A Services.")

13          The evidence supports the conclusion that Iovate USA and the other subsidiaries were

14  integral parts of one unified business enterprise that was owned, operated, and controlled by

15  Kerr/Gardiner.  It was Gardiner's show, and Gardiner was involved in almost every aspect of

16  the production.  Under these circumstances, it is fair to conclude there is such unity of interest

17  and ownership that the separate personalities of Kerr and Iovate USA no longer exist.

18          The Court also concludes that Plaintiffs have satisfied the unfairness prong of the alter

19  ego test.  A bad faith motive for asserting corporate separateness can be inferred from the fact

20  that the corporate resolution to change Kerr's name to "Kerr Investment Holding Corp." was

21  signed by Gardiner on April 29, 2009, the very same day that the FDA informed Kerr's counsel

22  that the FDA had concluded that Hydroxycut products present a severe potentially life-

23  threatening hazard to some users.  Prior to the name change, Kerr described its business

24  activity as selling advanced nutritional supplements.  After the name change, the description

25  of Kerr's business activity changed to operating as a holding company.  It would be reasonable

26  to conclude that Kerr was attempting to distance itself from the business activities of the Iovate

27  Companies because it appeared that litigation was imminent and Kerr wished to avoid liability.

28

09md2087

In <u>Craigslist, Inc. v. Mesiab</u>, 2010 WL 5300883, at * 7 (N.D. Cal.  Nov. 15, 2010), Craigslist argued that Mesiab Labs was created in an effort to avoid liability in the action and should be considered an alter ego of Easy Ad.  Craigslist submitted evidence in the form of an email, in which Mesiab (who did business as Easy Ad) talked about ways in which he could stop the entire lawsuit in its tracks by, among other things, establishing a new LLC under the name Mesiab Labs (in which he would be a silent partner).  The court held that the admission by Mesiab that Mesiab Labs was created as an entity that would remain "untouchable by present litigation," was sufficient to establish that defendants acted in bad faith and that an inequitable result would occur if Mesiab Labs was treated as a separate entity and not attached as a judgment debtor.

As in <u>Craigslist</u>, in response to litigation (imminent litigation in this case), Kerr made a conscious decision to attempt to hide behind its corporate form to avoid liability.  It would be unfair to allow Kerr to shield itself by creating a fiction of separateness.

The Court concludes that Plaintiffs have made a prima facie showing that Iovate USA acted as the alter ego of Kerr.

## D. <u>Reasonableness of Exercising Jurisdiction</u>

Because Plaintiffs have made a prima facie showing that Iovate USA acted as the agent and alter ego of Kerr, Iovate USA's contacts can be imputed to Kerr, and Plaintiffs have satisfied the minimum contacts requirement.  <u>Harris</u>, 328 F.3d at 1134.  Accordingly, to defeat personal jurisdiction, Kerr has the burden of proving that jurisdiction is unreasonable to defeat personal jurisdiction.  <u>Burger King v. Rudzewicz</u>, 471 U.S. 462, 477 (1985).

To determine whether the assertion of personal jurisdiction would comport with "fair play and substantial justice," courts evaluate factors such as the burden on the defendant, the forum state's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several states in furthering fundamental substantive social policies.  <u>Burger King</u>, 471 U.S. at 477.  Where an international defendant

09md2087

1   is involved, a court must also "consider the procedural and substantive policies of other nations

2   whose interest are affected by the assertion of jurisdiction" by the court.  Asahi Metal Industry

3   Co. v. Superior Court, 480 U.S. 102, 115 (1987).[12]

4          Kerr has purposefully interjected itself into the affairs of the various forums by selling the

5   Hydroxycut products through Iovate USA.  Iovate USA's sales make up almost all of the income

6   of the Iovate Companies.  The numerous plaintiffs who claim to have suffered damage in

7   connection with the purchase and/or consumption of Hydroxycut products have an interest in

8   litigating their claims in their chosen forums (and this MDL case) as opposed to in Canada.

9   This MDL action is an efficient means of adjudicating the large number of cases that have been

10  filed against Kerr throughout the United States.

11         Although it would probably be Kerr's preference to litigate in Canada, Kerr has not shown

12  that it would be a substantial burden on it to defend the lawsuits in the United States.  As

13  pointed out by Plaintiffs, Gardiner is already involved in litigation here in his role as CEO of

14  Iovate Sciences.  Although Canada might have some interest in adjudicating these lawsuits

15  because Kerr is a Canadian corporation, Kerr has not established that the exercise of

16  jurisdiction by this Court and the transferor courts conflicts with any procedural and substantive

17  policies of Canada.

18         In sum, Kerr, through Iovate USA, sold Hydroxycut products to retailers who sold them

19  to customers throughout the United States.  Iovate USA's sales were critical to the success of

20  the Iovate Companies' business enterprise.  Based on these facts, Kerr cannot convincingly

21  claim that it did not reasonably anticipate being haled into court here for damages arising out

22  of the purchase and consumption of the Hydroxycut products.  Kerr has not satisfied its burden

23  of establishing that the exercise of jurisdiction by this Court and the transferor courts is

24  _____

25         [12] The Ninth Circuit considers seven factors in evaluating reasonableness: (1) the extent
    of the defendant's purposeful interjection into the forum state's affairs; (2) the burden on the
26  defendant of defending in the forum; (3) the extent of conflict with the sovereignty of the
    defendants' state; (4) the forum state's interest in adjudicating the dispute; (5) the most efficient
27  judicial resolution of the controversy; (6) the importance of the forum to the plaintiff's interest
    in convenient and effective relief; and (7) the existence of an alternative forum.  Core-Vent
28  Corp. v. Nobel Indus. AB, 11 F3d 1482, 1487-88 (9th Cir. 1993).

09md2087

1 | unreasonable. Therefore, the Court concludes that Plaintiffs have made a prima facie showing

2 | of personal jurisdiction over Kerr.

3 |

4 | ### IV.  CONCLUSION

5 | For the reasons discussed above, Plaintiffs have made a prima facie showing of

6 | jurisdiction over Kerr, and Kerr's motions to dismiss for lack of personal jurisdiction filed in

7 | 09md2087 and the various individual actions are **DENIED**.  The Court emphasizes that its

8 | holding is limited to the issue of whether Plaintiffs have made a *prima facie* showing of personal

9 | jurisdiction.  Kerr may still raise the defense of lack of personal jurisdiction at trial.  Peterson

10 | v. Highland Music, Inc., 140 F.3d 1313, 1319 (9th Cir. 1998).   If Kerr does so, Plaintiffs must

11 | establish personal jurisdiction by a preponderance of the evidence.  Id.

12 | **IT IS SO ORDERED.**

13 |

14 | DATED: July 12, 2011

Honorable Barry Ted Moskowitz
United States District Judge

09md2087