UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE HYDROXYCUT MARKETING AND SALES PRACTICES LITIGATION ) ) | Case No. 3:09-mdl-02087-BTM-KSC |
| MINERVA THOMPSON, INDIVIDUALLY, AND AS REPRESENTATIVE OF THE ESTATE OF JOSEPH THOMPSON, DECEASED, | Case No. 3:11-cv-00660-BTM-KSC THIRD AMENDED COMPLAINT & DEMAND FOR JURY TRIAL |
| Plaintiff | |
| v. | |
| IOVATE HEALTH SCIENCES, INC., IOVATE HEALTH SCIENCES USA, INC. and MUSCLETECH RESEARCH AND DEVELOPMENT, INC. | |
| Defendants. | |

**THIRD AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff MINERVA THOMPSON, INDIVIDUALLY, AND AS REPRESENTATIVE OF THE ESTATE OF JOSEPH THOMPSON, DECEASED, residing at 93 Wintonbury Avenue, Bloomfield, Connecticut, 06002, by and through her undersigned attorneys, hereby sue the Defendants, IOVATE HEALTH SCIENCES, INC., IOVATE HEALTH SCIENCES USA, INC., MUSCLETECH RESEARCH AND DEVELOPMENT, INC., HVL LLC, BACTOLAC PHARMACEUTICALS INC., CAPSUGEL, PFIZER INC., GARDEN STATE NUTRITIONALS, INC. and INTERHEALTH NUTRACEUTICALS, INC. (hereinafter collectively referred to as "Defendants"), demanding a trial by jury and alleging as follows:

1

## NATURE OF THE ACTION

1. This is an action for damages suffered by Plaintiffs as a direct and proximate result of the Defendants' negligent and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, distribution, labeling, and/or sale of various formulations of dietary supplements called Hydroxycut.

2. Defendants have marketed, distributed and sold a number of over-the-counter ("OTC") Hydroxycut products for weight loss and as fat burners under the brand names "Iovate" and "MuscleTech."

3. The products include, but are not limited to:

   a. Hydroxycut Regular Rapid Release Caplets;
   b. Hydroxycut Caffeine-Free Rapid Release Caplets;
   c. Hydroxycut Hardcore Liquid Caplets;
   d. Hydroxycut Max Liquid Caplets;
   e. Hydroxycut Regular Drink Packets;
   f. Hydroxycut Caffeine-Free Drink Packets;
   g. Hydroxycut Hardcore Drink Packets (Ignition Stix);
   h. Hydroxycut Max Drink Packets;
   i. Hydroxycut Liquid Shots;
   j. Hydroxycut Hardcore RTDs (Ready-to-Drink);
   k. Hydroxycut Max Aqua Shed;
   l. Hydroxycut 24;
   m. Hydroxycut Carb Control; and
   n. Hydroxycut Natural

4. (Collectively referred to herein as the "Hydroxycut products").

5. Defendants have marketed the Hydroxycut products as being both safe and effective in assisting weight loss.

6. On May 1, 2009, the Food and Drug Administration ("FDA") announced a recall of the Hydroxycut products referenced above, following at least 23 reports of liver problems, including one death. Other reported health problems included seizures, cardiovascular disorders and rhabdomyolysis, a

2

THIRD AMENDED COMPLAINT AND REQUEST FOR JURY TRIAL   Case No. 3:11-cv-00660-BTM-CAB

form of muscle damage that can cause kidney failure. According to the FDA, these injuries occurred at the doses of Hydroxycut indicated in the product labeling.

7. Contrary to Defendants' representations, Hydroxycut products are unsafe when used as directed.

8. But for and as a direct result of Defendants' negligent and deceptive conduct, Plaintiff would not have purchased products which carried such significant safety risks when used as directed.

9. As a result of the defective nature of Hydroxycut, those persons who purchased and ingested the product, including Plaintiff, have suffered and continue to suffer severe and permanent injuries, including liver problems, seizures, cardiovascular disorders, death, and rhabdomyolysis, a form of muscle damage that can cause kidney failure.

10. Defendants could have and should have designed Hydroxycut in such a way as to eliminate the risk of significant injuries, including liver problems, seizures, cardiovascular disorders, and rhabdomyolysis, a form of muscle damage that can cause kidney failure.

11. Defendants knew of the significant risk of liver problems, seizures, cardiovascular disorders, and rhabdomyolysis caused by ingestion of Hydroxycut, but Defendants did not adequately and sufficiently warn consumers, including Plaintiff, of such risks.

12. Defendants failed to conduct adequate testing of Hydroxycut, both before and after it began marketing, advertising, distributing and selling the product.

13. As a result of Defendants' actions, Decedent Joseph Thompson was unaware, and could not have reasonably known or have learned through reasonable diligence, that he had been exposed to the risks identified in this complaint, and that those risks were the direct and proximate result of Defendants' acts, omissions, and misrepresentations.

THIRD AMENDED COMPLAINT AND REQUEST FOR JURY TRIAL                    Case No. 3:11-cv-00660-BTM-CAB

14. As a direct result, Decedent Joseph Thompson ingested Hydroxycut and died on January 14, 2009.

15. Consequently, Plaintiff seeks actual and punitive damages for her late husband's injuries resulting from his ingestion of Hydroxycut, which has caused and will continue to cause Plaintiff to suffer mental anguish and other injuries, as well as to incur significant expenses.

## **THE PARTIES**

16. Plaintiff, JOSEPH THOMPSON, was a citizen of the State of Connecticut. Plaintiff purchased and ingested Hydroxycut Instant Drink Packets, which are manufactured, distributed and sold by Defendants, to treat and assist him in the loss of weight.

17. Plaintiff, MINERVA THOMPSON, a citizen of the State of Connecticut is the spouse of Decedent Joseph Thompson.

18. Defendant, Iovate Health Sciences, Inc., is a corporation organized and existing under the laws of Ontario, Canada, and has a principal place of business at 381 North Service Road in Oakville, Ontario, Canada.

19. Defendant, Iovate Health Sciences USA, Inc., is a Delaware corporation with its principal place of business located at 3880 Jeffery Boulevard in Blasdell, New York, 14219, which developed, tested, manufactured, promoted and distributed the Hydroxycut products throughout the United States, including Connecticut.

20. Defendant, MuscleTech Research and Development, Inc. ("MuscleTech"), is a foreign corporation organized under the laws of Ontario, Canada, with its principal place of business in Mississauga, Ontario, Canada, and in the United States in Blasdell, New York. MuscleTech developed, tested, manufactured, promoted and distributed Hydroxycut products throughout the United States, including Connecticut.

21. Defendant, HVL LLC, is a Delaware corporation with its principal place of business located at 600 Boyce Road, Pittsburgh, Pennsylvania, 15205.

22. Defendant, HVL LLC, was regularly engaged in the State of Connecticut, *inter alia*, in the business of, and did design, contract to manufacture, manufacture, advertise, promote, market, sell and distribute nutritional/dietary supplements under the proprietary name Hydroxycut products throughout the United States, including to thousands of consumers in Connecticut, *inter alia*, and as a part of their business, said Defendant manufactured/formulated/packaged Hydroxycut products as a contactor to the IOVATE HEALTH SCIENCES GROUP, INC., IOVATE HEALTH SCIENCES U.S.A. INC., IOVATE HEALTH SCIENCES, INC. and MUSCLETECH RESEARCH AND DEVELOPMENT, INC.

23. Defendant, BACTOLAC PHARMACEUTICAL INC., is a Delaware corporation with its principal place of business located at 7 Oser Avenue, Hauppauge, New York, 11788.

24. Defendant, BACTOLAC PHARMACEUTICAL INC., was regularly engaged in the State of Connecticut, *inter alia*, in the business of and did design, contract to manufacture, manufacture, advertise, promote, market, sell, and distribute nutritional/dietary supplements under the proprietary name Hydroxycut products throughout the United States, including thousands of consumers in Connecticut, *inter alia*, and as a part of their business, said Defendant manufactured/formulated/packaged Hydroxycut products as a contractor to the IOVATE HEALTH SCIENCES GROUP, INC., IOVATE HEALTH SCIENCES U.S.A. INC., IOVATE HEALTH SCIENCES, INC. and MUSCLETECH RESEARCH AND DEVELOPMENT, INC.

25. Defendant, CAPSUGEL, is a partnership with its principal place of business located at 535 North Emerald Road, Greenwood, South Carolina, 29646.

26. Upon information and belief, at all relevant times, Defendant CAPSUGEL was a subsidiary of Pfizer Inc.

27. Defendant, CAPSUGEL, was regularly engaged in the State of Connecticut, *inter alia*, in the business of and did design, contract to manufacture, manufacture, advertise, promote, market, sell and distribute nutritional/dietary supplements under the proprietary name of Hydroxycut products throughout the United States, including thousands of consumers in Connecticut, *inter alia*, and as part of the business, said Defendant manufactured/formulated/packaged Hydroxycut products as a contractor to the IOVATE HEALTH SCIENCES GROUP, INC., IOVATE HEALTH SCIENCES U.S.A. INC., IOVATE HEALTH SCIENCES, INC. and MUSCLETECH RESEARCH AND DEVELOPMENT, INC.

28. Defendant, PFIZER INC., is a Delaware corporation with its principal place of business located at 235 East 42nd Street, New York, New York, 10017.

29. Defendant, PFIZER, INC., was regularly engaged in the State of Connecticut, *inter alia*, in the business of and did design, contract to manufacture, manufacture, advertise, promote, market, sell and distribute nutritional/dietary supplements under the proprietary name of Hydroxycut products throughout the United States, including thousands of consumers in Connecticut, *inter alia*, and as part of the business, said Defendant manufactured/formulated/packaged Hydroxycut products as a contractor to the IOVATE HEALTH SCIENCES GROUP, INC., IOVATE HEALTH SCIENCES U.S.A. INC., IOVATE HEALTH SCIENCES, INC. and MUSCLETECH RESEARCH AND DEVELOPMENT, INC.

30. Defendant, GARDEN STATES NUTRITIONALS, INC., is a New Jersey corporation with its principal place of business located at 8 Henderson Drive, West Caldwell, New Jersey, 07006.

6

THIRD AMENDED COMPLAINT AND REQUEST FOR JURY TRIAL    Case No. 3:11-cv-00660-BTM-CAB

31. Defendant, GARDEN STATES NUTRITIONALS, INC., was regularly engaged in the State of Connecticut, *inter alia*, in the business of and did design, contract to manufacture, manufacture, advertise, promote, market, sell and distribute nutritional/dietary supplements under the proprietary name of Hydroxycut products throughout the United States, including thousands of consumers in Connecticut, *inter alia*, and as part of the business, said Defendant manufactured/formulated/packaged Hydroxycut products as a contractor to the IOVATE HEALTH SCIENCES GROUP, INC., IOVATE HEALTH SCIENCES U.S.A. INC., IOVATE HEALTH SCIENCES, INC. and MUSCLETECH RESEARCH AND DEVELOPMENT, INC.

32. Defendant, INTERHEALTH NUTRACEUTICALS, INC., is a California corporation with its principal place of business located at 5451 Industrial Way, Benicia, California, 94510.

33. Defendant, INTERHEALTH NUTRACEUTICALS, INC., was regularly engaged in the State of Connecticut, *inter alia*, in the business of and did design, contract to manufacture, manufacture, advertise, promote, market, sell and distribute nutritional/dietary supplements under the proprietary name of Hydroxycut products throughout the United States, including thousands of consumers in Connecticut, *inter alia*, and as part of the business, said Defendant manufactured/formulated/packaged Hydroxycut products as a contractor to the IOVATE HEALTH SCIENCES GROUP, INC., IOVATE HEALTH SCIENCES U.S.A. INC., IOVATE HEALTH SCIENCES, INC. and MUSCLETECH RESEARCH AND DEVELOPMENT, INC.

34. Upon information and belief, at all times mentioned herein, the employees of all Defendants, their subsidiaries, affiliates, and other related entities, as well as the employees of the Defendants' subsidiaries, affiliates, and other related entities, were the agents, servants and employees of Defendants, and at all relevant times, were acting within the purpose and scope of said agency and employment. Whenever reference is made in this Complaint to any act or transaction of Defendants,

such allegations shall be deemed to mean that the principals, officers, employees, agents, and/or representatives of the Defendants committed, knew of, performed, authorized, ratified and/or directed such act or transaction on behalf of Defendants while actively engaged in the scope of their duties.

### JURISDICTION AND VENUE

35. This Court has jurisdiction pursuant to 28 United States Code Section 1332, as complete diversity exists between Plaintiff and Defendants. The amount in controversy exceeds seventy-five thousand dollars ($75,000.00), exclusive of interest and costs.

36. This Court has subject matter jurisdiction over the controversy because the damages are within the jurisdictional limits of the Court.

37. Venue in this action properly lies in the Southern District of Texas pursuant to 28 United States Code Section 1391, as Defendants have conducted substantial business in this district and each Defendant is subject to personal jurisdiction in this District. This is a tag-a-long action to In Re Hydroxycut Marketing and Sales Practices Litigation, Case No. 3:09-md-02087-BTM-KSC.

38. This suit alleges violations of Connecticut law and common law, and alternatively, comparable law of the State of Texas, and seeks to recover damages and other relief, including the costs of suit, for the injuries Plaintiff sustained as a result of Defendants' acts and omissions.

### GENERAL ALLEGATIONS

39. Over the counter weight loss products are readily available and come in many different formulas utilizing a wide range of ingredients claimed to be safe and effective in the loss of weight.

40. Hydroxycut products contain a variety of ingredients, including herbal extracts, chemicals and metals.

41. Hydroxycut products also contain hydroxycitrie acid ("HCA"), which is a botanical extract of a fruit from the Garcinia cambogia free that is native to India.

42. Citrate, a natural chemical in our bodies, slows down the enzyme that makes fatty acids out of carbohydrates, and hydroxycitric acid ("HCA") is chemically almost identical to citrate. In fact, HCA is believed to slow down the fat-making enzyme even more than natural citrate does.

43. Defendants marketed their Products as the "the right choice for fast weight loss" and represented that the Products are made of "all natural" ingredients which are "research- proven" to work effectively. The Products' packaging promotes their use to "increase energy," "burn calories" and "control appetite." Specifically, the Products' packaging states:

Hydroxycut® is America's #1 selling weight-loss supplement. Hydroxycut really does work - fast! Utilizing sophisticated Rapid-Release Caplets, Hydroxycut is doctor formulated with clinically proven ingredients to help you lose up to 4.5 times the weight than diet and exercise alone. Now with an improved HydroxyTea® blend, there's even more reason to love Hydroxycut®."

44. The Products' packaging also states: "[d]on't take chances - you deserve the best! Put your trust in the power of Hydroxycut® and discover for yourself why millions of men and women all across America have used Hydroxycut. For fast weight loss, make Hydroxycut® your #1 choice today!"

45. The Products' packaging emphasizes that the Products are "doctor formulated" and approved. In this regard, the Products' packaging boasts that the Products are "Backed by Science" and includes a picture of Dr. John Marshall, D.O., "Resident Physician," and his statement that "Hydroxycut® is a product that has ingredients proven to work. I've recommended it to a number of men and women and have used it myself with fantastic results." The Products' packaging also credits Dr. Marvin Heuer, FAAFP, Iovate's Chief Scientific Officer, with formulating the Products.

46. Defendants' website represents to consumers that their products are safe and effective in making the following statements under the heading, "Our Commitment to Research and Quality:"

> *By continuing our commitment to research, we're formulating sports supplements that are unmatched in quality and efficacy. We take great*

> *pride in producing the very best sports supplements. By continuing our commitment to research, we're formulating sports supplements that are designed to work when combined with diet and exercise — including innovative supplements designed for those who are following a carbohydrate-controlled lifestyle. When searching for supplements that can help push your aspirations to new heights, trust MuscleTech® supplements. Supplements That Work!®*
>
> \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
>
> *Plain and simple, Hydroxycut was designed to help you reach your weight-loss goals. This medical doctor-formulated supplement contains ingredients that are the highest quality and have been combined to make it one of the most effective weight-loss supplements available On the market today. Hydroxycut® is comprised of a blend of research-proven key ingredients that can help you lose up to 4.5 times the weight than diet and exercise alone.\* On top of that, this top-selling weight loss supplement increases your energy and helps control your appetite too. With Hydroxycut in your diet and exercise plan, you 'll be well on your way to achieving your weight-loss goals in no time!*

47. Defendants' website further makes the following statements about their testing and safety of products, under the question/heading, "What steps do you take to ensure the safety of Hydroxycut-branded products?"

> *We conduct internal analyses of individual ingredients, and undertake extensive medical, scientific and toxicological literature reviews on the safety of the ingredients during the development stage of each product. Additionally, third-party experts from the leading independent scientific firm specializing in ingredient assessment, toxicology and product safety for the nutritional and pharmaceutical industry review the safety of Iovate's ingredients and formulas before products are introduced in the marketplace. Only after this external review is completed does Iovate release a formula.*

48. As required by federal law, namely, the 1994 Dietary Supplement Health and Education Act (DSHEA), Defendant Iovate provided written notification to the FDA that the representations they made regarding the safety of their products were "truthful and not misleading."

---

10

THIRD AMENDED COMPLAINT AND REQUEST FOR JURY TRIAL          Case No. 3:11-cv-00660-BTM-CAB

49. Despite Defendants' representations, none of the specific ingredients nor the products as a whole themselves have been demonstrated to be safe for the loss of weight, loss of fat, increase in energy or increase in metabolism.

50. Based upon Defendants' marketing, labeling, distribution and sale of the Hydroxycut products, it was and is reasonable for Decedent to rely on Defendants' representations in purchasing and taking the Hydroxycut products.

51. However, in connection with the reports of health problems, it has been revealed that there is no evidence that these OTC supplements are safe when used as directed and for which they are marketed, distributed and sold by Defendants.

52. Indeed, recent reports and studies have shown the opposite to be the case, and that the Hydroxycut products are not safe for the purposes for which Defendants have marketed and sold them, such as weight loss, and in fact, have caused numerous health problems, including but not limited to, liver damage.

53. In the May 1 Advisory, the FDA recommended that people stop taking any Hydroxycut products because serious and potentially life-threatening side effects can occur. The Advisory further advised consumers that it had: the FDA "strongly advise[d]" consumers of "the potential risk of severe liver injury" associated with consumption of the Products and to discontinue use of all the Products.

54. Specifically, the FDA's announcement stated:

> [It] had received 23 reports of serious health problems ranging from jaundice and elevated liver enzymes, an indicator of potential liver injury, to liver damage requiring liver transplant. One death due to liver failure has been reported to the FDA. Other health problems reported include seizures; cardiovascular disorders; and rhabdomoyolysis, a type of muscle damage that can lead to other serious health problems such as kidney failure.
>
> Liver injury, although rare, was reported by patients at the doses of Hydroxycut recommended on the bottle. Symptoms of liver injury include

11

THIRD AMENDED COMPLAINT AND REQUEST FOR JURY TRIAL          Case No. 3:11-cv-00660-BTM-CAB

jaundice (yellowing of the skin or whites of the eyes) and brown urine. Other symptoms include nausea, vomiting, light-colored stools, excessive fatigue, weakness stomach or abdominal pain, itching, and loss of appetite.

"The FDA urges consumers to discontinue use of Hydroxycut products in order to avoid any undue risk. Adverse events are rare, but exist. Consumers should consult a physician or other health care professional if they are experiencing symptoms possibly associated with these products," said Linda Katz, M.D., interim chief medical officer of the FDA's Center for Food Safety and Applied Nutrition.

55. The FDA has learned of several other serious problems that some Hydroxycut product users have had, including seizures, rhabdomyolysis (a type of muscle damage that can lead to other serious problems, such as kidney failure), and cardiovascular problems, ranging in severity from irregular heart beat to heart attack.

56. Symptoms are believed to manifest either while a person is taking Hydroxycut products, or up to several months after a person stops taking it.

57. Defendants, through their promotion, labeling and selling of Hydroxycut, falsely, deceptively and materially misrepresented to consumers, including Decedent, that Hydroxycut was a safe product when, in fact, it was not.

58. Additionally, despite their knowledge of the unsafe and dangerous nature of Hydroxycut, Defendants recklessly, negligently and knowingly failed to provide needed, accurate, and adequate information regarding the health hazards of Hydroxycut to those such as Plaintiff who would reasonably and foreseeably use the product.

59. Defendants intended that consumers, including Decedent, would rely on Defendants' omissions and misrepresentations regarding Hydroxycut and the dangers and health risks associated with the product.

12

THIRD AMENDED COMPLAINT AND REQUEST FOR JURY TRIAL   Case No. 3:11-cv-00660-BTM-CAB

60. Defendants' omissions and representations were negligently, recklessly or knowingly false and misleading as to Plaintiffs, and were made with the intent of inducing Plaintiffs into purchasing and using Hydroxycut.

61. Decedent believed and justifiably relied upon Defendants' omissions and representations and was thereby induced into purchasing and using Hydroxycut.

### Decedent's Experience with Hydroxycut

62. Decedent purchased and used Hydroxycut wild berry Regular Drink Packets in January 2009.

63. Decedent used Hydroxycut Regular Drink Packets as directed and for the purpose and in the manner for which it was normally intended.

64. Decedent could not by the exercise of reasonable care discover the defective nature and perceive the dangers of Hydroxycut drink packets.

65. As a direct and proximate result of using Hydroxycut Regular Drink Packets, Decedent died on January 14, 2009.

66. Decedent suffered severe mental and physical pain and suffering, and ultimately death, as a direct and proximate result of using Hydroxycut Regular Drink Packets.

67. As a direct and proximate cause of the injuries and damages sustained by Decedent, Plaintiff Minerva Thompson has permanently lost the support, services, comfort, companionship, society and care of her husband.

68. Decedent would not have purchased and used Hydroxycut Regular Drink Packets had Defendants properly disclosed the risks associated with the product.

### COUNT I
### Violation of Connecticut Product Liability Act

69. The foregoing paragraphs of this Complaint are realleged and incorporated by reference.

70. Defendants designed, tested, manufactured, marketed, sold and/or distributed Hydroxycut Regular Drink Packets. As such, they had a duty to warn the using public, including Decedent, of the health risks associated with the subject product

71. The subject product was under the exclusive control of Defendants and was unaccompanied by appropriate warnings regarding the health risks associated with its use. The warnings given did not accurately reflect the risk, incidence, symptoms, scope or severity of such injuries to the consumer. The promotional activities of Defendants further diluted or minimized the warnings given with the product.

72. The subject product was defective and unreasonably dangerous when it left the possession of the Defendants in that it contained warnings insufficient to alert Decedent to the dangerous risks and reactions associated with it, including, but not limited to, liver and cardiac problems. Even though Defendants knew or should have known of the risks and reactions associated with the subject product, they still failed to provide warnings that accurately reflected the signs, symptoms, incidence, scope, or severity of these risks.

73. Decedent used the subject product for its intended purpose, as a dietary supplement to assist in weight loss.

74. Decedent could not have discovered any defect in the subject product through the exercise of reasonable care.

75. Decedent would not have used Hydroxycut Regular Drink Packets had Defendants properly disclosed the risks associated with the product.

76. Defendants, as manufacturers of over-the-counter health care products, are held to the level of knowledge of an expert in the field, and further, Defendants had knowledge of the dangerous risks and side effects of the subject product.

THIRD AMENDED COMPLAINT AND REQUEST FOR JURY TRIAL   Case No. 3:11-cv-00660-BTM-CAB

77. Decedent did not have the same knowledge as Defendants, and no adequate warning was communicated to him.

78. Defendants had a continuing duty to warn consumers, including Decedent, of the dangers associated with the subject product. By negligently and/or wantonly failing to adequately warn of the dangers of use of the subject product, Defendants breached their duty.

79. Although Defendants knew of the defective nature of the subject product, they continued to design, manufacture, market, and sell it without providing adequate, accurate, and complete warnings concerning its use so as to maximize sales and profits at the expense of the public health and safety in knowing, conscious , and deliberate disregard of the foreseeable harm caused by the subject product.

80. As a direct and proximate result of the Defendants' failure to adequately warn or other wrongdoing and actions of Defendants described herein, Decedent sustained serious and permanent injuries that ultimately led to his untimely and tragic death. As a direct and proximate result of the injuries and damages sustained by Decedent, Plaintiff, Decedent's surviving spouse, has lost the support, services, comfort, companionship, society and care of her husband. Plaintiff will continue to suffer injury, harm, and economic loss.

81. Defendants are the manufacturer, seller, distributor, marketer, and/or supplier of the subject product, which is defective and unreasonably dangerous to consumers.

82. The subject product was designed, manufactured, sold, distributed, supplied, marketed, and/pr promoted by Defendants, and was expected to reach and did reach consumers, including Decedent, without substantial change in the condition in which it was manufactured and sold by Defendants.

83. The subject product was defective in its design and was unreasonably dangerous in that its foreseeable risks exceeded the benefits associated with its design or formulation.

84. Consumers, including Decedent, who have used Hydroxycut Regular Drink Packets for weight loss, have several alternative safer products available to treat this condition.

85. Although Defendants actually knew of the defective nature of the subject product, they continued to design, manufacture, market, and sell it so as to maximize sales and profits at the expense of the public health and safety, in knowing, conscious, and deliberate disregard of the foreseeable harm caused by the subject product.

86. As a direct and proximate result of the design defects of the subject product, Decedent sustained serious and permanent injuries that ultimately led to his untimely and tragic death. As a direct and proximate result of the injuries and damages sustained by Decedent, Plaintiff, Decedent's surviving spouse, has lost the support, services, comfort, companionship, society and care of her husband. Plaintiff will continue to suffer injury, harm, and economic loss.

WHEREFORE, Plaintiff demands judgment against Defendants for compensatory and punitive damages, together with interest and all such other relief as the Court deems proper.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays of this Court and demand of Defendants as follows:

a. That Plaintiff be granted and recover actual damages incidental to Decedent's purchase and use of Hydroxycut Regular Drink Packets in an amount to be determined at trial;

b. That Plaintiff be granted pre-judgment and post-judgment interest;

c. That the costs of this action be taxed to Defendants; and

d. For such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

The Plaintiff demands a trial by jury on all issues.

16

THIRD AMENDED COMPLAINT AND REQUEST FOR JURY TRIAL     Case No. 3:11-cv-00660-BTM-CAB

Dated: May 17, 2012

Respectfully Submitted,

WILLIAMS, KHERKHER, HART, BOUNDAS, LLP

/s/ G. Erick Rosemond
JOHN T. BOUNDAS
TX Bar No. 0079336
USDC SDTX Bar No. 25155
MARGRET E. LECOCKE
TX Bar No. 24046280
USDC SDTX Bar No. 690374
G. ERICK ROSEMOND
CA Bar No. 226389
8441 Gulf Freeway, Suite 600
Houston, TX 77019
(713) 230-2200 (phone)
(713) 643-6226 (fax)
ATTORNEYS FOR PLAINTIFF

### CERTIFICATE OF SERVICE

I hereby declare that on this 17th day of May, 2012, Plaintiff, Minerva Thompson's, Third Amended Complaint and Demand for Jury Trial was electronically filed and transmitted to the Clerk of Court using the ECF System with notification to all attorneys of record who are ECF registrants. Non-CM/ECF registrant parties will receive a copy via United States Postal Service First Class Mail and/or email.

/s/ Margret E. Lecocke