FILED

12 JUN 29 AM 8: 39

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY: _____        DEPUTY

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| IN RE HYDROXYCUT MARKETING AND SALES PRACTICE LITIGATION | CASE NO. 3:09-md-2087-BTM(KSC)<br><br>**ORDER RE PLAINTIFFS' BELLWETHER SELECTIONS**<br><br>[Doc. No. 1350] |

Before the Court is the parties' Joint Motion for Ruling on Plaintiffs' Bellwether Selections, along with exhibits and declarations by counsel in support of the parties' respective positions. [Doc. Nos. 1350, 1351.] Pursuant to the Joint Bellwether Plan approved by the Court and filed on March 19, 2012, the parties each selected certain plaintiffs to proceed to trial as test cases. In the parties' Joint Motion, defendants seek an order from the Court disqualifying plaintiffs Mario Moraga and Flor Mendoza from proceeding to trial as test cases in the bellwether program.

Defendants argue plaintiffs' selection of Moraga and Mendoza violates Section IV(A)(4) of the Joint Bellwether Plan, because both of these plaintiffs claim they consumed more than one type of Hydroxycut product. As a result, defendants argue the claims of these plaintiffs are not representative enough to provide reliable information for the other cases filed in this Multi-District Litigation ("MDL"). Defendants seek an order precluding Moraga and Mendoza from participating in the bellwether program. For the reasons outlined below, the Court finds defendants' request for an order precluding plaintiffs Moraga and Mendoza from participating in the bellwether program must be GRANTED in part and DENIED in part.

[Case # for Footer (96CV0012)]

***Background***

On February 24, 2012, the parties submitted a Proposed Joint Bellwether Plan for the Court's consideration. At this time, the parties also agreed to submit letter briefs on disputed sections of the proposed plan. [Doc. No. 1080.] On February 29, 2012, defendants submitted a letter brief addressing several issues, including the necessity of including the "product consumption limitation" shown at Sections IV(A)(4) and IV(A)(9) of the Proposed Joint Bellwether Plan in order to prevent complex causation issues. [Doc. No. 1083, pp. 6-7.] The record indicates plaintiffs disagreed with the need for the proposed "product consumption limitation" but did not file an opposing letter brief. [Doc. No. 1080-1, at pp. 5-6.]

On March 19, 2012, the Court approved the Joint Bellwether Plan. [Doc. No. 1110.] The approved plan included the "product consumption limitation" at Sections IV(A)(4) and IV(A)(9). As part of the approved plan, plaintiffs and defendants were directed to each select a total of four (4) "bellwether cases" and one back-up case, with at least one case from each side being selected from two different categories of products consumed. [Doc. No. 1110, at pp. 3-4.]

The parties filed their respective bellwether selections with the Court on April 27, 2012. [Doc. Nos. 1238, 1239.] Thereafter, defendants notified plaintiffs they objected to the selection of plaintiffs Moraga and Mendoza to participate in the bellwether program, because they consumed more than one type of Hydroxycut product and were therefore ineligible under the "product consumption limitation." Defendants requested that plaintiffs withdraw these cases as bellwether selections. [Doc. No. 1293-3, pp. 1-4.] Plaintiffs took the position these selections are not ineligible under the "product consumption limitation, because they "are really single product cases." Plaintiffs therefore declined to withdraw Moraga and Mendoza as bellwether selections. [Doc. No. 1293-4, at pp. 2-4.] Defendants then filed a formal Objection with the Court on May 9, 2012. [Doc. No. 1292, at pp. 3-4.] On May 25, 2012, the parties filed their Joint Motion for Ruling on Plaintiffs' Bellwether Selections. [Doc. No. 1350.]

***Discussion***

Federal courts have the authority to conduct a "bellwether trial" under Federal Rule of Civil Procedure 42(b), which provides in part as follows: "For convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one more separate issues, [or] claims . . . ."

[Case # for Footer (96CV0012)]

1  Fed.R.Civ.P. 42(b).  "The term bellwether is derived from the ancient practice of belling a wether (a

2  male sheep) selected to lead his flock. The ultimate success of the wether selected to wear the bell was

3  determined by whether the flock had confidence that the wether would not lead them astray, and so it

4  is in the mass tort context. The notion that the trial of some members of a large group of claimants may

5  provide a basis for enhancing prospects of settlement or for resolving common issues or claims is a

6  sound one that has achieved general acceptance by both bench and bar." *In re Chevron U.S.A., Inc.*, 109

7  F.3d 1016, 1019 (5th Cir. 1997).  There are several approaches to selecting representative plaintiffs.

8  *Sterling v. Velsicol Chemical Corp.*, 855 F.2d 1188, 1196 n.6.)  Here, the selection of individual

9  plaintiffs by the parties with oversight from the court is similar to approaches taken by other courts in

10  designating representative bellwether cases for trial.  See, e.g., *In re Vioxx Products Litigation*, 501

11  F.Supp.2d 789, 791 (2007).

12  If "bellwether trials or test cases are to produce reliable information about other mass tort cases,

13  the specific plaintiffs and their claims should be representative of the range of cases. . . .  Test cases

14  should produce a sufficient number of representative verdicts and settlements to enable the parties and

15  the court to determine the nature and strength of the claims, whether they can be fairly developed and

16  litigated on a group basis, and what range of values the cases may have if resolution is attempted on a

17  group basis. The more representative the test cases, the more reliable the information about similar cases

18  will be." FEDERAL JUDICIAL CENTER, MANUAL FOR COMPLEX LITIGATION § 22.315 (4th ed. 2004).

19  Thus, "representativeness" is a "core element" that must be present for a bellwether trial "to achieve its

20  value ascertainment function for settlement purposes or to answer troubling causation or liability issues

21  common to the universe of claimants." *Chevron*, 109 F.3d at p. 1019.

22  Here, the Court approved the Joint Bellwether Plan and included the "product consumption

23  limitation" to address defendants' concern that plaintiffs who "consumed multiple products [would] not

24  provide a representative basis for analysis of bellwether cases, given the multitude of potential causative

25  issues that would need to be developed, as well as scientific issues that would need to be explored."

26  [Doc. No. 1083, at p. 7.] In a letter brief submitted to the Court on February 29, 2012, defendants argued

27  convincingly that plaintiffs who consumed only one product would be more representative of other cases

28  currently pending in [this MDL] and would assist the bellwether process by allowing comparison

1   between bellwether cases and other pending cases. [Doc. No. 1083, at p. 7.] Defendants also argued

2   plaintiffs' proposal to pick cases without limitation would "unnecessarily complicate matters" and

3   "effectively eviscerate[] the bellwether plan." [Doc. No. 1083, at p. 7.] Without a principled basis for

4   selection of bellwether plaintiffs, defendants argued the plan would fail to achieve its goal of producing

5   fair evaluations of the relative merits of these cases which could then be used to assist in evaluating the

6   merits of many other cases in the litigation. [Doc. No. 1083, at p. 7.]

7       There are fourteen products involved in the Hydroycut litigation. [Doc. No. 1083, at 6.] Some

8   plaintiffs consumed multiple Hydroxycut products which contain multiple different ingredients. [Doc.

9   No. 1083, at p. 6.] According to defendants, limiting the bellwether plaintiffs to those who only

10  consumed one type of Hydroxycut product "will allow for a simplification of the bellwether proceedings

11  . . . by allowing the experts to focus on the more limited universe of ingredients involved in each

12  product" rather than the inter-relationship of reactions to different products. [Doc. No. 1083, at p. 6.]

13      Plaintiff's position on the need for the "product consumption limitation" was stated as follows

14  in the parties' Proposed Joint Bellwether Plan: "Plaintiffs do not agree with this provision. Plaintiffs

15  will select their cases without limitation." [Doc. No. 1080-1, at pp. 5-6.] Plaintiffs had an opportunity

16  prior to the Court's approval of the Joint Bellwether Plan to submit a letter brief stating the reasons for

17  their position but did not do so.  [Doc. Nos. 1080, 1080-1, at pp. 5-6.] Nor do plaintiffs contend in the

18  parties' Joint Motion that the "product consumption limitation" is unnecessary.  Instead, plaintiffs

19  essentially argue that Moraga and Mendoza fall within the spirit of the "product consumption limitation"

20  based on the specific facts of their respective cases, even though it could be said they took more than

21  one Hydroxycut product. [Doc. No. 1350, at p. 2.]

22      Defendants have represented that the majority of plaintiffs claim one of two product lines caused

23  their injuries: (1) Hydroxycut Hardcore Products, and (2) Hydroxycut "White Box" Products (Rapid

24  Release). Each of these product lines includes multiple product types.  Types of Hydroxycut Hardcore

25  Products include Hydroxycut Hardcore Liquid Caplets, Hydroxycut Hardcore Drink Packets, and

26  Hydroxycut Hardcore RTDs. [Doc. No. 1083, at pp. 6-7.]  The Joint Bellwether Plan assigns these

27  products to "Category 1." [Doc. No. 1110, at p. 3.] Types of Hydroxycut "White Box" Products include

28  Hydroxycut Regular Rapid Release Caplets and Hydroxycut Caffeine-Free Rapid Release Caplets. [Doc.

[Case # for Footer (96CV0012)]

1   No. 1083, at pp. 6-7.] The Joint Bellwether Plan assigns these products to "Category 2." [Doc. No. 1110,

2   at p. 4.]  Since the majority of plaintiffs allege injuries as a result of the two product lines delineated as

3   Category 1 and Category 2, the Joint Bellwether Plan requires the parties to each choose a total of four

4   (4) cases for inclusion in the bellwether process, *with at least one from each of the . . . two (2)*

5   *categories.*" (Emphasis added.)  [Doc. No. 1110, at pp. 3-4.] However, the "product consumption

6   limitation" at Sections IV(A)(4) and IV(A)(9) of the Joint Bellwether Plan states that: "If a Plaintiff took

7   *more than one type of Hydroxycut product* they are not eligible for participation in the bellwether

8   program."[1]  (Emphasis added.)  [Doc. No. 1110, at pp. 4-5.]

9        Plaintiff Mario Moraga.  Plaintiffs concede Moraga consumed a Hydroxycut Hardcore Product

10   (Category 1) in 2005 and a Hydroxycut Rapid Release Product (Category 2) in late 2007.  After taking

11   a Hydroxycut Rapid Release Product (Category 2) continuously from October 2007 until December

12   2007, Moraga alleges he became ill, was diagnosed with acute liver failure, and needed a liver transplant

13   in January 2008. [Doc. No. 1350, at p. 3.]

14        Plaintiffs argue Moraga should not be disqualified under the "product consumption limitation,"

15   because he only used one Hydroxycut product that could have been the cause of his injuries.  Plaintiffs

16   believe the irrelevance of Moraga's consumption of the Hydroxycut Hardcore Product (Category 1) in

17   2005 is established by: (1) the remoteness of Moraga's use of the Hydroxycut Hardcore Product

18   (Category 1) in 2005 to the manifestation of his alleged injuries in 2007; (2) a treating doctor's report

19   stating Moraga needed a liver transplant "as a result of two months of Hydroxycut use;" and (3) the

20   results of Moraga's blood tests from February 2007 which show his liver was functioning normally

21   before his consumption of the Hydroxycut Rapid Release Product (Category 2) in late 2007. [Doc. No.

22   1350, at p. 3-4.]

23        Despite plaintiffs' argument to the contrary, the record does not conclusively establish the

24   irrelevance of Moraga's use of the Hydroxycut Hardcore Product (Category 1) in 2005.  First, the

25   doctor's report states only that Moraga had a liver transplant "for acute liver failure secondary to

26

27        [1]     In their Joint Motion, the parties have erroneously cited Section IV(A)(9) as the subject
    of their dispute.  Although Sections IV(A)(4) and IV(A)(9) are identical, Section IV(A)(4) applies to
28   plaintiffs' bellwether selections.  Section IV(A)(9) applies to defendants' bellwether selections.  The
    parties' dispute involves plaintiffs' bellwether selections, so the relevant provision is Section IV(A)(4).

1   Hydroxycut-induced hepatotoxicity." [Doc. No. 1350-2, at p. 17.] The report does not state Moraga's
2   liver failure was caused solely as a result of his consumption of the Hydroxycut Rapid Release Product
3   in 2007.  Nor does this report definitively rule out Moraga's consumption of a Hydroxycut Hardcore
4   Product in 2005 as a contributing cause of his liver failure in 2007.  Second, the results of Moraga's
5   blood tests from February 2007 are not enough, standing alone, to show his consumption of the
6   Hydroxycut Hardcore Product (Category 1) in 2005 is completely irrelevant to a causation analysis.

7        At this stage of the litigation, it is simply not possible to eliminate the potential that Moraga's
8   admitted use of the Hydroxycut Hardcore Product in 2005 played a causal role in his subsequent personal
9   injuries which manifested in 2007, after his consumption of Hydroxycut Rapid Release Product in 2007.
10  Having consumed more than one Hydroxycut product that could have played a causal role in his alleged
11  injuries, Moraga's case involves too many variables and, as a result, it is simply not representative
12  enough to provide a useful basis for analysis when the circumstances at issue in his case are compared
13  to other pending cases after a trial on the merits. FEDERAL JUDICIAL CENTER, MANUAL FOR COMPLEX
14  LITIGATION § 22.315 (4th ed. 2004).  As a result, Moraga's continued participation in the bellwether
15  program would deprive other parties of the ability to properly evaluate the strengths and weaknesses of
16  their claims, based on the outcome of the representative claims in the bellwether cases.  Additionally,
17  under the circumstances presented, it is possible that the two products used by the proposed bellwether
18  plaintiff were manufactured by different companies, further complicating the causation analysis.  The
19  "product consumption limitation" was specifically included in the Joint Bellwether Plan to prevent this
20  kind of complex causation analysis.  A complicated causation analysis could easily defeat the purpose
21  of the bellwether plan by diminishing the relative value of a comparison of Moraga's case to other
22  pending cases.  This Court therefore concludes defendants are entitled to an order precluding plaintiff
23  Moraga from participating in the bellwether program.

24       Plaintiff Flor Mendoza.  In February 2009, plaintiff Mendoza purchased Hydroxycut Rapid
25  Release Caplets (Category 2) with promotional drink packets that were affixed to the package.  [Doc.
26  Nos. 1350, at p. 5; 1350-2, at pp. 29-41.] Defendants refer to the drink packets as "Hydroxycut Powder
27  Packs," which are not specifically listed under Category 1 or 2. [Doc. No. 1350, at pp. 4-5.] Mendoza
28  consumed the Hydroxycut Rapid Release Caplets (Category 2) from February 2009 through April 2009.

1  [Doc. No. 1350-2, at p. 22.]   In a deposition, Mendoza testified she only used one of the affixed

2  promotional drink packets during this same time period. [Doc. No. 1350-2, at p. 22, Doc. No. 1350-2,

3  at pp. 44-45.] In April 2009, Mendoza was diagnosed with acute liver failure and needed a transplant.

4  [Doc. No. 1350, at p. 4.]

5  Plaintiffs argue that Mendoza's one-time use of the drink packet affixed to the Hydroxycut Rapid

6  Release Caplets (Category 2) is not enough to disqualify her from participation in the bellwether plan.

7  According to plaintiffs, the Hydroxycut promotional drink packets are not a different type of product

8  from the Hydroxycut Rapid Release Caplets, because they were sold together as a single product and

9  contain the same active ingredients. [Doc. No. 1350, pp. 4-5.] Therefore, it appears these are the same

10  product and the only difference between the two is the form -- one is a caplet and the other is a small

11  packet of powder that is poured into water or some other liquid before use. [*See* Doc. No. 1350-2, pp.

12  29-41.]

13  Defendants' position is that the Hydroxycut promotional drink packets are a different type of

14  product than the Hydroxycut Rapid Release Caplets even though the two products were sold in a

15  "combination pack[]." [Doc. No. 1350, at p. 9.]   However, defendants have not cited anything from

16  which this Court could conclude the two products sold in combination contain materially different

17  ingredients.  Assuming these two products do not contain materially different ingredients, Mendoza's

18  claims are not likely to raise any of the complex causation issues that the "product consumption

19  limitation" was designed to prevent.  Therefore, under the circumstances presented, there is no valid

20  reason for the Court to disqualify Mendoza as a bellwether plaintiff.  As a result, the Court finds

21  defendants are not entitled to an order precluding plaintiff Mendoza from participating in the bellwether

22  program.

23  ### *Conclusion*

24  Based on the foregoing, IT IS HEREBY ORDERED THAT:

25  1.  Defendants' request for an order precluding plaintiff Mario Moraga from participating

26  in the bellwether program is GRANTED.

27  2.  Defendants' request for an order precluding plaintiff Flor Mendoza from participating

28  in the bellwether program is DENIED.

[Case # for Footer (96CV0012)]

1    3.    _No later than July 5, 2012_, plaintiffs shall file and serve an amended notice of their

2  bellwether selections which complies with the requirements of the Joint Bellwether Plan and does not

3  include plaintiff Mario Moraga.

4          IT IS SO ORDERED.

5  Date: _June 28_, 2012

6

7

8                                          KAREN S. CRAWFORD
                                           United States Magistrate Judge
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 8 -                                      [Case # for Footer (96CV0012)]