1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE HYDROXYCUT MARKETING AND SALES PRACTICES LITIGATION | CASE NO. 09md2087 BTM(KSC) |
| ANDREW DREMAK, on Behalf of Himself, All Others Similarly Situated and the General Public, | CASE NO.  09cv1088 BTM(KSC) |
| Plaintiff, | **ORDER GRANTING MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT** |
| v. | |
| IOVATE HEALTH SCIENCES GROUP, INC., et al., | |
| Defendants. | |

Co-Lead Class Counsel (and Proposed Class Counsel for the Settlement Class) have filed a Motion for Final Approval of Class Action Settlement.  The Court held a hearing on the motion on October 15, 2014.  No objectors were present.  For the reasons set forth below, the Court **GRANTS** the motion for final approval of the Settlement.

# I. **BACKGROUND**

In this consolidated class action lawsuit, Plaintiffs assert consumer injury claims in connection with their purchase of the Hydroxycut Products.[1]   This lawsuit does not involve personal injury claims.

A.  Procedural Background

On December 22, 2009, the First Consolidated Amended Class action Complaint ("FAC") was filed in this multi-district litigation.  Twenty named plaintiffs asserted claims on behalf of themselves and a putative nationwide class of persons who purchased Hydroxycut Products (14 specific Hydroxycut-branded products).

On March 8, 2010, the Court issued an order appointing Timothy G. Blood of Blood Hurst & O'Reardon, LLP ("BHO") and Andrew S. Friedman of Bonnett, Fairbourn, Friedman, & Balint, P.C. ("BFFB") as Co-Lead Class Counsel.

In an order filed on May 31, 2011, the Court granted in part and denied in part motions to dismiss the FAC.  The Court dismissed Plaintiffs' consumer protection, express warranty, and unjust enrichment claims against the Iovate Defendants and Retailer Defendants.  The Court held that Plaintiffs had failed to satisfy Rule 9(b)'s heightened pleading standard because the FAC was vague as to what representations each plaintiff relied on and whether each plaintiff actually saw advertising claims before purchasing the Hydroxycut Product.

---

[1] The "Hydroxycut Products" refer to the fourteen Hydroxycut-branded products at issue in this litigation sold in the United States prior to May 1, 2009, specifically:  Hydroxycut Regular Rapid Release Caplets, Hydroxycut Caffeine-Free Rapid Release Caplets, Hydroxycut Hardcore Liquid Caplets, Hydroxycut Max Liquid Caplets, Hydroxycut Regular Drink Packets, Hydroxycut Caffeine-Free Drink Packets, Hydroxycut Hardcore Drink Packets (Ignition Stix), Hydroxycut Max Drink Packets, Hydroxycut Liquid Shots, Hydroxycut Hardcore RTDs, Hydroxycut Max Aqua Shed, Hydroxycut 24, Hydroxycut Carb Control, and Hydroxycut Natural. The definition excludes Hydroxycut-branded products containing ephedra, and Hydroxycut-branded products available for purchase prior to December 1, 2004 or after May 1, 2009.

09md2087

In an order filed on July 12, 2011, the Court denied a motion to dismiss for lack of personal jurisdiction filed by defendant Kerr Investment Holding Corp. f/k/a Iovate Health Sciences Group Inc.

On August 8, 2011, Plaintiffs filed the Second Consolidated Amended Class Action Complaint.  ("SAC").

On March 8, 2013, Plaintiffs filed a motion for final approval of class action settlement.  After holding a hearing on the motion on October 22, 2013, the Court issued an order denying final approval.  The Court denied final approval on the ground that the proposed *cy pres* distribution was being used as a vehicle to settle the personal injury cases, not to provide an indirect prospective benefit to the entire class.

In an order filed on January 27, 2014, the Court denied motions to dismiss the SAC filed by Defendants, but ordered Plaintiff to provide a more definite statement as to the Retailer Defendants (GNC Corporation, Wal-Mart Stores, Inc., Walgreens Company, CVS Caremark Corp., Vitamin Shoppe Industries, Inc., NBTY, Inc., BJ's Wholesale Club, Inc., Kmart Corporation, and Rite Aid Corporation).  The Court held that Plaintiffs had failed to plead fraud with particularity as to the Retailer Defendants.  The Court also held that apart from Rule 9(b)'s particularity requirements, most of Plaintiffs had failed to state a claim against the Retailer Defendants under the various state consumer protection laws because Plaintiffs (1) did not allege that prior to purchasing a Hydroxycut Product they saw/heard a specific representation made, adopted, or controlled by a Retailer Defendant; and (2) did not allege sufficient facts establishing aider and abettor liability for representations made by Iovate.

In May 2014, the Court granted preliminary approval of the current class action settlement.  On August 29, 2014, Plaintiffs filed their motion for final approval of the class action settlement.

09md2087

B.  <u>Terms of the Settlement</u>

The main features of the Settlement are as follows:

- $14 million non-reversionary Settlement Fund consisting of a $7 million Cash Component and a $7 million Product Component.

- Class members without proof of purchase may elect to receive cash payments of $15 per purchase for up to three purchases.

- If money remains in Cash Component (after paying eligible cash claims, notice and claim administration expenses, attorney's fees and expenses, taxes and tax expenses, and service awards) each cash claim will be increased pro rata up to $50 for each product purchased.

- If any amounts still remain in the Cash Component, the money will go to ChangeLab Solutions, a non-profit organization that works to combat false and misleading advertising regarding food and nutrition, or a similar organization.

- Class members without proof of purchase may elect to receive a free Product Unit for up to three purchases. The Product Unit shall have a retail price of at least $25. For each Product Unit Award, class members may choose any one of the following: (1) Hydroxycut Pro Clinical (72 count); (2) Hydroxycut Hardcore (60 count); (3) Hydroxycut Caffeine Free (72 Count); and (4) Hydroxycut Max (60 count).

- Amounts remaining in the Product Component will be distributed nationwide in the form of additional product (Pro Clinical Hydroxycut or such other products that are top-selling throughout the United States) at the time of purchase by the consumer.  The value of the additional product shall be calculated at the manufacturers' suggested retail price of the regular size Hydroxycut-branded product, less 15%.  The additional product will be distributed over an eighteen-month period. Within 60 days of the Effective Date of the Settlement, Iovate will provide Class counsel with a distribution plan regarding the Additional Product and will also provide Class Counsel with a bimonthly distribution report detailing the distribution of Additional Product.

- Iovate agrees to not oppose Plaintiffs' counsel's application for attorney's fees not to exceed $3,500,000 and for expenses not to exceed $300,000.  Plaintiffs' counsel seeks $3.5 million in attorneys fees and $204,378.21 in costs.

- •        Iovate does not oppose payment of service awards to class representatives in the amount of $2,000 each.

C. <u>Notice to the Class and Claims Administration</u>

Notice was provided to the class pursuant to the process previously approved by the Court. <u>See</u> Decl. of Cameron R. Azari. The Settlement Administrator mailed individual notices and also disseminated notice through four consumer publications, over a thousand Sunday local newspapers, and popular websites. Additional notice was provided through an Informational Release and the Settlement website. The Notice Plan reached an estimated 81.1% of adults who take an over-the-counter remedy for weight loss.

Boston Financial was appointed and approved as Claims Administrator in this matter. Boston Financial has performed its duties pursuant to the Preliminary Approval Order and the Stipulation of Settlement, including: mailing the Current Eligible Claimant Notice to Current Eligible Claimants; establishing and maintaining a website to provide information regarding the proposed settlement and to allow online claims submissions; developing and staffing live operator services and a toll free number with interactive voice response system; forwarding copies of the Notice, Claim Form, and other related documents to potential Class Members upon request; and receiving, logging, and processing requests for exclusion, claims forms, proofs of claim, and other communications. <u>See</u> Decl. of Madeline J. Fitzgerald. The deadline for submitting claims is January 13, 2015.[2]

//

//

---

[2] The Court finds that Plaintiffs have satisfied the notice requirements of Rule 23, which requires that the court direct to class members "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."

09md2087

## II. **DISCUSSION**

A. Class Certification

Plaintiffs seek final certification of the Settlement Class, defined as all persons in the United States who purchased any of the Hydroxycut Products from May 9, 2006 through May 1, 2009. Excluded from the Settlement Class are: (i) those who purchased Hydroxycut Products for the purpose of resale; (ii) Iovate and its officers, directors and employees; (iii) any person who files a valid and timely Request for Exclusion; and (iv) the Judge(s) to whom this Action is assigned and any members of their immediate families.

To certify a settlement class, the requirements of Rule 23 must generally be satisfied. Hanlon v. Chrysler Corp., 150 F.3d 1011, 1019 (9th Cir. 1998). However, the Court need not inquire whether the case, if tried, would present management problems. Amchem Prods., Inc. v. Windsor, 521 U.S. 1, 613 (1997).

Rule 23(a) sets forth four prerequisites for class certification: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. The Court finds that all four of these requirements have been satisfied.

The numerosity requirement is satisfied if "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Here, the class would include purchasers of the Hydroxycut Products, which were sold nationwide at major retailers, over a time period of three years. The Court has no doubt that the numerosity requirement has been met.

Rule 23(a)(2) requires "questions of law or fact common to the class." Commonality requires that the class members' claims depend upon a "common contention," which is of such a nature that "it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Wal-Mart

09md2087

Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2551 (2011).   Central common contentions in this case include allegations that the Hydroxycut Products were unsafe and did not provide the weight-loss benefits that were touted in advertisements and labeling.

Rule 23(a)(3) requires that the "claims or defenses of the representative parties are typical of the claims or defenses of the class."  The claims of the class plaintiffs need not be identical to those of the absent class members, but, rather must be "reasonably co-extensive."  Hanlon, 150 F.3d at 1020.  "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct."  Hanon v. Dataproducts Corp., 976 F.2d 497, 508 (9th Cir. 1992) (internal quotation marks and citation omitted).  Plaintiffs' claims are typical of the claims of the other members of the class because the SAC alleges that Defendants engaged in a unified course of conduct – i.e., false and deceptive marketing regarding the safety and benefits of the Hydroxycut Products – that resulted in consumers not getting what they thought they were paying for.

The Court must also determine whether the "representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  This determination depends on the resolution of two questions: (1) whether the named plaintiffs and their counsel have any conflicts of interest with other class members; and (2) whether the named plaintiffs and their counsel will prosecute the action vigorously on behalf of the class.  Hanlon, 150 F.3d at 1020.  No conflict of interest is apparent to the Court.  Furthermore, Class Counsel have significant experience in class action litigation and have vigorously prosecuted this action to reach this settlement.

In addition to satisfying the requirements of Rule 23(a), a proposed class must qualify for certification under one of the categories in Rule 23(b).  Plaintiffs

09md2087

1   seek certification under Rule 23(b)(3).  Certification is proper under Rule 23(b)(3)

2   if "the court finds that the questions of law or fact common to class members

3   predominate over any questions affecting only individual members, and that a

4   class action is superior to other available methods for fairly and efficiently

5   adjudicating the controversy."

6        The predominance inquiry "tests whether proposed classes are sufficiently

7   cohesive to warrant adjudication by representation" and "focuses on the

8   relationship between the common and individual issues." Hanlon, 150 F.3d at

9   1022 (internal quotation marks and citation omitted).  "When common questions

10  represent a significant aspect of the case and they can be resolved for all

11  members of the class in a single adjudication, there is a clear justification for

12  handling the dispute on a representative rather than on an individual basis."

13  Wright, Miller & Kane, Federal Practice and Procedure: Civil 3d § 1778.  When

14  one or more of the central issues in the action are common to the class and can

15  be deemed to predominate, certification may be proper under Rule 23(b)(3) even

16  though other important matters, such as damages or affirmative defenses, will

17  have to be tried separately.  Id.

18       Common issues predominate in this litigation even though claims have

19  been brought under various state consumer protection laws.  Central to this

20  action are issues regarding whether Defendants engaged in false advertising

21  regarding the safety and efficacy of the Hydroxycut Products.  Plaintiffs allege a

22  common injury caused by Defendants' common course of conduct.

23       The Court also finds that a class action is the appropriate vehicle to resolve

24  this controversy.  Pursuant to Rule 23(b)(3), the Court should consider four

25  non-exclusive factors when considering whether class action is a superior method

26  of adjudication, including: (1) the class members' interest in individual litigation,

27  (2) other pending litigation, (3) the desirability of concentrating the litigation in one

28  forum, and (4) difficulties with the management of the class action.  Here, the

09md2087

1  damages for each class member would be small.  Therefore, class members
2  would have little motivation to pursue individual cases.  Furthermore, due to the
3  common issues in this case, it is desirable to litigate the claims in one forum to
4  ensure consistency of rulings and findings.  The Court need not be concerned
5  regarding any difficulties with management of the class action due to this
6  settlement.

7  In sum, the Court finds that the requirements of Rule 23(a) have been
8  satisfied and certifies the Settlement Class under Rule 23(b)(3).

9
10  B. <u>Fairness, Reasonableness, and Adequacy of the Settlement</u>

11
12  1. <u>Legal Standard</u>
13  Before approving a class action settlement, the court must determine
14  whether the proposed settlement is fair, reasonable, and adequate.  Fed. R. Civ.
15  P. 23(e)(2).  In reaching this determination, courts consider a number of factors,
16  including:   (1) the strength of the plaintiff's case; (2) the risk, expense, complexity,
17  and likely duration of further litigation; (3) the risk of maintaining class action
18  status throughout the trial; (4) the amount offered in settlement; (5) the extent of
19  discovery completed and the stage of the proceedings; (6) the experience and
20  views of counsel; (7) the presence of a governmental participant; and (8) the
21  reaction of the class members to the proposed settlement.  <u>Churchill Vill., L.L.C.</u>
22  <u>v. Gen. Elec.</u>, 361 F.3d 566, 575 (9th Cir.2004).

23  When a settlement agreement is negotiated prior to formal class
24  certification, the court must also scrutinize the settlement for evidence of collusion
25  or other conflicts of interest.  <u>In re Bluetooth Headset Products Liability Lit.</u>, 654
26  F.3d 935, 946-47 (9th Cir. 2011).  Signs of collusion include: (1) when counsel
27  receive a disproportionate distribution of the settlement; (2) when the parties
28  negotiate a "clear sailing" arrangement that provides for the payment of attorneys'

09md2087

1  fees separate and apart from class funds; and (3) when the parties arrange for
2  fees not awarded to revert to defendants rather than to be added to the class
3  fund.  Id. at 947.

4

5       2. Strength of Plaintiffs' Case

6       As pointed out by Plaintiffs, if this case continues, Plaintiffs face significant
7  hurdles to recovery on their claims.  The Court's January 27, 2014 Order made
8  it clear that Plaintiffs would have to allege more specific facts regarding (1) how
9  each Retailer Defendant participated in or controlled representations that were
10 seen and/or heard by a plaintiff prior to purchasing a Hydroxycut Product; and (2)
11 aider and abettor liability for representations made by Iovate.  According to
12 Plaintiffs, the Court's ruling effectively eliminated their claims against the Retailer
13 Defendants.  Plaintiffs also explain that without the Retailer Defendants in the
14 litigation, there is a real risk that Plaintiffs would be left without a defendant from
15 whom a judgment could be collected.  Furthermore, Defendants have made it
16 clear that they would challenge class certification based on, among other things,
17 the various state laws involved and individualized inquiries that would have to be
18 made.  Defendants also contend that their claims regarding the effectiveness of
19 the Hydroxycut Products were not misleading and that their warnings were
20 sufficient.  Given the uncertainties of continued litigation, this factor weighs in
21 favor of approval of the Settlement.

22

23       3.  Risk, Complexity, Expense, and Duration of the Litigation

24       As discussed above, there are substantial risks in continued litigation, which
25 would certainly be time-consuming and costly.  In addition to continued challenges
26 to the pleadings by the Retailer Defendants, it is expected that Defendants would
27 oppose class certification.  Continued litigation would involve the expense of
28 additional discovery and the hiring of numerous experts for both sides.  This

09md2087

1 Settlement alleviates the need to engage in expensive, protracted litigation and,
2 as discussed below, provides a significant benefit to the Class.

3

4        4.   Amount Offered in Settlement

5        This Settlement offers substantial benefits to the class members. Without
6 proof of purchase, class members may elect to receive cash payments of $15 per
7 product purchased for up to three purchases, or up to three free Product Units
8 (each with a retail price of at least $25).  Cash payments will probably be even
9 higher than $15 per purchase because amounts remaining in the Cash
10 Component (after paying eligible cash claims, notice and claims administration
11 expenses, attorney's fees and expenses, taxes and tax expenses, and service
12 awards) are to be used to increase cash claims pro rata up to $50 for each
13 product purchased.  At the Final Approval Hearing, Class Counsel estimated that
14 the cash award would end up being close to $40 per purchase.  Many claimants
15 will receive compensation that exceeds their damages.  According to Defendants'
16 market research, the average Settlement Class Member purchased 2.2 units of
17 Hydroxycut Product.   The benefits provided by the Settlement are real and
18 significant.  The Court notes that Class members who suffered personal injuries
19 will be compensated for those injuries through the personal injury settlement.

20

21        5.   Stage of the Proceedings & Experience and Views of Counsel

22        The parties in this case have engaged in substantial discovery and this
23 litigation is at an advanced stage.   Therefore, the parties are in a position to
24 accurately assess the strengths and weaknesses of their respective positions.
25 Class Counsel are experienced class action litigators and believe that the
26 Settlement represents an excellent recovery for the Class.  Accordingly, these
27 factors favor final approval of the settlement as well.

28

09md2087

6.  <u>Reaction of the Class Members to the Proposed Settlement</u>

It appears that the reaction of Class Members to the Settlement is positive. There have been only six requests for exclusion (FitzGerald Decl. ¶ 11) and two filed objections.  No objectors appeared at the final approval hearing.

a.  <u>Objection by Bobi Little</u>

Ms. Little objects to paying amounts left in the Cash Component to ChangeLab Solutions.  Ms. Little argues that any remaining money should be distributed to purchasers.  However, according to Class Counsel, based on the current claims rate, all cash will be distributed to Class Members, and no significant amount will be left for *cy pres* distribution.  Therefore, the Court overrules Ms. Little's objection.

b.  <u>Objection by Sigge Malkvist</u>

Class Counsel move to strike Malkvist's objection because it does not list his real address as required by the Order Preliminarily Approving Class Action Settlement and the Class Notice.  The address listed by Malkvist is the address for a UPS Store.  The Court denies Class Counsel's motion to strike but overrules the objection on the merits.

Malkvist argues that the structure of the settlement is unfair because after subtracting attorney's fees and expenses from the cash component, there isn't much left for the Class Members.  Malkvist further argues that the actual value of Hydroxycut products distributed is likely to be only a small percentage of the $7 million.  According to Malkvist, the settlement disadvantages Class Members, the majority of whom would prefer cash.

However, the Settlement is structured so that Class Members can choose either cash or product.  Some Class Members may actually prefer the product with a retail value of at least $25.  At the final approval hearing, Iovate's counsel

09md2087

explained that there is high brand loyalty among its customers, who are likely to be repeat purchasers.  The cash remaining after subtracting attorney's fees and administrative expenses is 2.6 or 2.7 million.  This is not a paltry sum, and the cash awards (estimated by Class Counsel to be up to $40 per purchase) will be substantial.

Malkvist complains that product distribution is not as good as cash and compares product distribution to coupon settlements that mask the benefit actually received by the class members.  Malkvist also contends that it is unknown whether the current products are safe, and that it is inappropriate to encourage class members to continue using Hydroxycut products.

The product option is not comparable to a coupon.  Class Members do not have to buy or pay anything to get the product, which has an identifiable retail value.  Furthermore, the Settlement requires that the free product "consist of different ingredient formulations as compared to the Hydroxycut Products," and the offered products do not contain any of the ingredients alleged to be dangerous in this litigation.  (Stipulation of Settlement, §IV.C.6.b.)  The Class Members can exercise their own free will and judgment regarding whether they should continue to use Hydroxycut products.

Malkvist contends that the payments to the Class Representatives show they have a conflict of interest vis-a-vis the class because they are getting significantly more payment than the class members.  However, the proposed incentive awards are only $2,000 each.  This is a modest amount and in keeping with incentive awards in this Circuit.  Class Representatives should receive more than the average class member because of their efforts in furthering the litigation.

Malkvist objects that the attorney's fees are too high.  Comparing the product option to coupons, Malkvist takes the position that the Court should look at how many product units are actually redeemed when determining attorney's fees based on percentage of the common fund.  In addition, Malkvist argues that

09md2087

1 the value of the products should not be calculated based on retail price. Malkvist

2 also argues that the costs of notice and settlement administration as well as *cy*

3 *pres* distribution should be excluded for purposes of calculating attorney's fees.

4      As already discussed, the product units are not comparable to coupons.

5 Therefore, the cases governing coupons are not applicable. Seven million dollars'

6 worth of product has been made available to Class Members; Malkvist does not

7 cite any relevant authority that the value of the common fund should be based on

8 how many product units end up actually being claimed. Similarly, there is no

9 authority for excluding *cy pres* distribution amounts for purposes of determining

10 attorney's fees. As for the "value" of the product units, retail value is an accurate

11 measure of benefit to the class. See e.g, Hall v. AT&T Mobility LLC, 2010 WL

12 4053547, at * 10 (D.N.J. 2010) (non-cash benefits consisting of prepaid calling

13 cards with retail value not exceeding $2,000,000). The expenses incurred for

14 notice and claims administration were for the benefit of the class and are typically

15 borne by class plaintiffs. See, e.g., Miller v. Ghirardelli Chocolate Co., 2014 WL

16 4978433 (N.D. Cal. Oct. 2, 2014).

17      Finally, Malkvist suggests that ChangeLab Solutions might not be an

18 appropriate *cy pres* recipient. Malkvist does not provide specific reasons for

19 objecting to ChangeLab Solutions. At any rate, as already discussed, it does not

20 appear that there will be any funds left in the Cash Component to be distributed

21 to ChangeLab Solutions.

22

23      7.  Lack of Collusion

24      Because this settlement was reached prior to class certification, the Court

25 examines the Settlement for evidence of collusion. Bluetooth, 654 F.3d at 946-

26 47. The Court does not find any evidence of collusion. Class Counsel seek a fee

27 award totaling 25% of the Settlement Fund. This percentage of recovery is typical

28 and does not represent a disproportionate distribution of the settlement to

counsel.  <u>Six Mexican Workers v. Ariz. Citrus Growers</u>, 904 F.2d 1301, 1311 (9th Cir. 1990).  Although there is a "clear sailing" provision, it does not raise concerns regarding collusion because the attorney's fees are to be paid from the Settlement Fund as opposed to on top of the Settlement Fund.  <u>See, e.g.</u>, <u>Rodriguez v. West Publishing Corp.</u>, 563 F.3d 948, 961 n.5 (9th Cir. 2009).  Attorney's fees not awarded do not revert back to Defendants.

Moreover, this case was vigorously litigated over the course of several years.  The parties engaged in extensive settlement negotiations and participated in multiple mediation sessions with two different mediators.  The history of the case as well as the substantial benefit provided to the Class by the Settlement convince the Court that there has been no collusion.

8.  <u>Final Approval</u>

Upon consideration of the relevant factors, the Court finds that the Settlement is fair, reasonable, and adequate.  Therefore, the Court grants final approval of the Settlement.

C.  <u>Attorney's Fees</u>

Class Counsel, on behalf of themselves and other Plaintiffs' counsel, seek an award of attorney's fees in the amount of $3.5 million, equal to 25% of the $14 million Settlement Fund.

The Ninth Circuit has established 25% of a common fund as a benchmark award for attorney's fees.  <u>Six Mexican Workers</u>, 904 F.2d at 1311.  The court may depart from this benchmark percentage if special circumstances indicate that the percentage recovery would be either too small or too large.  <u>Id.</u>  The court's selection of the benchmark or any other rate must be supported by findings that take into account all of the circumstances of the case.  <u>Vizcaino v. Microsoft Corp.</u>, 290 F.3d 1043, 1047 (9th Cir. 2002).  Such factors include, but are not

09md2087

1   limited to: (1) the results achieved; (2) the risk involved in the litigation; (3)

2   incidental or nonmonetary benefits conferred by the litigation; and (4) financial

3   burden of the case on counsel. <u>Id.</u> at 1049-50.  Application of the "lodestar

4   method" may provide a useful "cross-check" as to the reasonableness of a given

5   percentage award. <u>Id.</u> at 1050.

6        The Court finds that 25% of the Settlement Fund is an appropriate award in

7   this case.  In reaching this conclusion, the Court has taken into account, among

8   other things, the quality of representation by counsel, the excellent results

9   achieved for the class, the risks of continued litigation given the weaknesses in

10  Plaintiffs' case, and the length and complexity of this hard-fought litigation, which

11  has spanned several years.   The Court finds no basis for departing from the

12  benchmark percentage.

13       The percentage award is supported by a lodestar cross check.  The lodestar

14  of Class Counsel alone is $3,365,350 as of August 27, 2014. <u>See</u> Decl. of

15  Timothy G. Blood (Doc.1872-2), ¶¶ 8, 10; Decl. of Elaine A. Ryan (Doc. 1872-3),

16  ¶ 7.   The Court finds that the hourly rates charged by Class Counsel are

17  reasonable and are typical rates for attorneys of comparable experience.  If the

18  Court also considers the lodestar of Milberg LLP, which amounts to $1,121,342.50

19  (Decl. of John R. S. McFarlane (Doc. 1637-6), ¶ 5), the total lodestar is

20  $,4,486,692.50.  Thus, the lodestar method confirms the reasonableness of the

21  percentage calculation.

22

23  D.  <u>Costs</u>

24       Class Counsel seek reimbursement of expenses totaling $202,545.19,[3]

25  incurred by Plaintiffs' Counsel to prosecute this litigation.

26

27  —————————————————

28       [3]  In their moving papers, Class Counsel requested reimbursement of $204,378.21.
     However, in supplemental briefing ordered by the Court, Milberg reduced its reimbursable
     expenses by $1,833.02.

09md2087

1    Plaintiffs' Counsel "may recover their reasonable expenses that would
2  typically be billed to paying clients in non-contingency matters." In re Omnivision
3  Tech., Inc., 559 F. Supp. 2d 1036, 1048 (N.D. Cal. 2008).  Here, the costs were
4  for filing fees, photocopies, postage, telephone charges, computer research,
5  mediation fees, and travel.  These are the types of expenses routinely charged to
6  paying clients.  See In re Media Vision Tech. Sec. Lit., 913 F. Supp. 1362 , 1367-
7  72 (N.D. Cal.  1996).

8    Therefore, the Court grants Class Counsel's request for reimbursement of
9  expenses in the amount of $202,545.19.

10

11  E.  Incentive Awards

12    Class Counsel requests a service award of $2,000 for each of the plaintiffs
13  named in the SAC and the other plaintiffs named as plaintiffs in the MDL class
14  actions.

15    The Court may, in its discretion, award incentive or service awards to named
16  plaintiffs to "compensate class representatives for work done on behalf of the
17  class, to make up for financial or reputational risk undertaken in bringing the
18  action, and, sometimes, to recognize their willingness to act as a private attorney
19  general."  Rodriguez v. West Publishing Corp., 563 F.3d 948, 958-59 (9th Cir.
20  2009).   District courts must carefully scrutinize incentive awards to ensure that
21  they do not undermine the adequacy of the class representatives.  Radcliffe v.
22  Experian Information Solutions, Inc., 715 F.3d 1157, 1165 (9th Cir. 2013.)

23    Plaintiffs' counsel have submitted declarations explaining that their clients
24  assisted the litigation by, among other things, providing information and
25  documents, meeting with counsel, supervising counsel on behalf of the Class,
26  participating in efforts leading to settlement, and approving the amount and type
27  of settlement proposed for the Class.  See Decl. of Timothy G. Blood (Doc. 1872-
28  2), ¶ 5, Decl. of Elaine A. Ryan (Doc. 1872-3), ¶ 17, Decl. of other Plaintiffs'

09md2087

Attorneys (Docs. 1637-5-1637-30).   The Court finds that the requested incentive payment of $2,000 for each of the Plaintiffs is reasonable to compensate them for the work done on behalf of the Class.

### III.  CONCLUSION

For the reasons set forth above, Plaintiffs' motion for final approval of the class action settlement is **GRANTED,** and judgment shall be entered according to the Final Order and Judgment filed concurrently herewith.

**IT IS SO ORDERED.**

DATED:  November 18, 2014

BARRY TED MOSKOWITZ, Chief Judge
United States District Court

18

09md2087